Stanceu, Chief Judge:
Plaintiff Nucor Corporation ("Nucor"), joined by plaintiff-intervenors ArcelorMittal USA LLC, AK Steel Corporation, and United States Steel Corporation, contests a final negative determination of the U.S. International Trade Commission (the "Commission," or the "ITC") that resulted in termination of a countervailing duty investigation of imports of certain hot-rolled steel flat products ("hot-rolled steel") from Turkey. The Commission terminated the investigation upon finding that the volume of subsidized hot-rolled steel imports from Turkey was negligible. The court sustains the Commission's determination.
I. BACKGROUND
A. The Contested Determination
The determination contested in this action was published as Certain Hot-Rolled Steel Flat Products From Australia, Brazil, Japan, Korea, the Netherlands, Turkey, and the United Kingdom , 81 Fed. Reg. 66,996 (Int'l Trade Comm'n Sept. 29, 2016) ("Final Determination "). The views of the Commission were contained in Certain Hot-Rolled Steel Flat Products from Australia, Brazil, Japan, Korea, the Netherlands, Turkey, and the United Kingdom , USITC Pub. 4638, Inv. Nos. 701-TA-545-547 and 731-TA-1291-1297 (Sept. 2016) (Final) (P.R. Doc. 494),[1] available at *1279 https://www.usitc.gov/publications/701_731/pub4638.pdf (last visited Feb. 23, 2018) ("Views of the Commission ").
B. The Commission's Countervailing Duty Investigation of Hot-Rolled Steel from Turkey
On August 11, 2015, six domestic steel producers filed, concurrently with the Commission and the International Trade Administration, U.S. Department of Commerce ("Commerce," or the "Department"), a petition seeking the initiation of antidumping duty ("AD") and countervailing duty ("CVD") investigations of hot-rolled steel from various countries. The petitioners, which were Nucor, plaintiff-intervenors AK Steel Corporation, ArcelorMittal USA LLC, and United States Steel Corporation, and two other U.S. steel producers, alleged that the industry producing hot-rolled steel in the United States was materially injured or threatened with material injury by reason of dumped and subsidized imports of hot-rolled steel from Brazil, Korea, and Turkey and from dumped imports of hot-rolled steel from Australia, Japan, the Netherlands, and the United Kingdom.
In response to the petition, the Commission initiated ten separate investigations.[2] The period of investigation ("POI") for the ITC's countervailing duty investigation of Turkish imports was January 1, 2013 through March 31, 2016. Views of the Commission at 10 n.31.
In its various antidumping duty and countervailing duty investigations, the Commission determined that the U.S. industry producing hot-rolled steel was being materially injured by reason of dumped imports of hot-rolled steel from Australia, Brazil, Japan, Korea, the Netherlands, Turkey, and the United Kingdom. Final Determination , 81 Fed. Reg. at 66,996. The Commission also reached an affirmative injury determination as to imports found to be subsidized by the governments of Brazil and Korea. Id. The Commission stated that it "further finds that imports of hot-rolled steel that have been found by Commerce to be subsidized by the government of Turkey are negligible." Id. On that basis, the ITC terminated Investigation No. 701-547, its countervailing duty investigation of hot-rolled steel from Turkey. Due to the ITC's negative determination, Commerce did not issue a countervailing duty order on hot-rolled steel from Turkey. See 19 U.S.C. § 1671d(c)(2).
C. Proceedings Before the Court of International Trade
Nucor commenced this litigation on November 23, 2016. Compl. (Nov. 23, 2016), ECF No. 8. Before the court is a motion for judgment on the agency record filed under USCIT Rule 56.2 on behalf of plaintiff Nucor and plaintiff-intervenors AK Steel Corporation, ArcelorMittal USA, LLC, and United States Steel Corporation.[3] Pl. Nucor Corporation and Pl.-Intervenors *1280 ArcelorMittal USA LLC, AK Steel Corporation, and United States Steel Corporation's Rule 56.2 Mot. for J. on the Agency Record (May 8, 2017), ECF Nos. 49 (confidential), 50 (public) ("Pl.'s Br."). The motion is opposed by defendant U.S. International Trade Commission and by defendant-intervenor Eregli Demir ve Celik Fabrikalari T.A.S., a Turkish producer of hot-rolled steel. The court held oral argument on January 18, 2018.
II. DISCUSSION
A. Jurisdiction and Standard of Review
The court exercises jurisdiction according to section 201 of the Customs Courts Act of 1980, 28 U.S.C. § 1581(c) (2012), which grants jurisdiction of civil actions brought under section 516A(a)(2)(B)(i) of the Tariff Act of 1930 (the "Tariff Act"), 19 U.S.C. § 1516a(a)(2)(B)(i).[4] Where, as here, an action is brought under 19 U.S.C. § 1516a(a)(2) seeking review of a final determination of the Commission reached under 19 U.S.C. § 1671d, "[t]he court shall hold unlawful any determination, finding, or conclusion found ... to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).
B. Plaintiff's Claims in this Litigation
In its countervailing duty investigation of hot-rolled steel from Turkey, the ITC made two related negligibility determinations, each of which is the basis for a claim Nucor asserts in this litigation.
1. Nucor's Claim under 19 U.S.C. § 1677(24)(A)(i) ("Clause (i)")
The ITC determined that the subsidized imports of hot-rolled steel from Turkey were "negligible" within the meaning of 19 U.S.C. § 1677(24)(A)(i) ("clause (i)"). Imports are negligible under clause (i) if they "account for less than 3 percent of the volume of all such merchandise imported into the United States in the most recent 12-month period for which data are available that precedes ... the filing of the petition."[5] Id. The Commission found, first, that the volume of imports of Turkish hot-rolled steel that were subsidized by the government of Turkey was less than 3% of the volume of all hot-rolled steel imported into the United States during the relevant period (which the ITC determined to be August 1, 2014 to July 31, 2015). Views of the Commission at 12-13. The Commission reached that finding following the determination by Commerce of a de minimis final subsidy rate for the hot-rolled steel produced and exported to the United States by one of the Turkish producer/exporters subject to the Department's countervailing duty investigation, Colakoglu Dis Ticaret A.S. ("Colakoglu"). Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat Products from the Republic of Turkey , 81 Fed. Reg. 53,433, 53,434 (Int'l Trade Admin. Aug. 12, 2016).
Nucor does not contest the ITC's finding that the volume of Turkish hot-rolled steel imports Commerce found to have been subsidized was less than 3% of the total *1281 import volume of hot-rolled steel imported into the United States during the relevant period. Instead, Nucor claims that the ITC misinterpreted the statute in making the negligibility determination under clause (i) according to that finding. In support of this claim, Nucor argues that the statute required the ITC to base the negligibility calculation on the volume of all of the Turkish imports originally subject to the countervailing duty investigation, not merely those Commerce later found to be subsidized. Nucor argues in the alternative that the statute required the Commission to make the negligibility calculation under clause (i) by including not only the volume of imports Commerce found to be subsidized, but also the volume of imports Commerce found to be dumped in the parallel antidumping duty investigation of hot-rolled steel from Turkey. According to Nucor, had the ITC correctly applied the negligibility provision in clause (i) according to either of these methods, it would have had to find the import volume to be 7.4% of the volume of total imports of hot-rolled steel from Turkey during the relevant period, well exceeding the threshold for non-negligibility.
2. Nucor's Claim under 19 U.S.C. § 1677(24)(A)(iv) ("Clause (iv)")
Nucor's second claim is in the alternative as to its first claim. Nucor claims that, even if the ITC were correct in its negligibility determination under clause (i), it erred in failing to apply an exception to negligibility provided for under 19 U.S.C. § 1677(24)(A)(iv) ("clause (iv)"). According to clause (iv), the Commission, for purposes of determining threat of material injury, "shall not treat imports as negligible if it determines that there is a potential that imports from a country described in clause (i) will imminently account for more than 3 percent of the volume of all such merchandise imported into the United States ...." Id. Nucor claims that the ITC's finding that there was no such potential was unsupported by substantial evidence on the record.
Having determined under clause (i) that subsidized imports of hot-rolled steel from Turkey were negligible and having further determined under clause (iv) that there was not a potential that subsidized hot-rolled steel imports from Turkey would imminently exceed the 3% threshold for threat, the Commission terminated the countervailing duty investigation. Views of the Commission at 12-14.
C. The Commission Did Not Misinterpret the Tariff Act when Making Its Negligibility Determination under Clause (i)
If Commerce reaches final affirmative determinations of subsidization and dumping in parallel investigations on imports of merchandise from the same country, the ITC is required by the Tariff Act to make separate final determinations as to whether an industry (or industries) in the United States is materially injured, or threatened with material injury, by reason of imports that are subsidized and by reason of imports that are sold (or likely to be sold) in the United States at less than fair value, i.e., imports that are dumped.[6] See 19 U.S.C. §§ 1671d(b)(1) (final determination by the ITC of injury or threat by reason of imports found by Commerce to be subsidized), 1673d(b)(1) (final determination by the ITC of injury or threat by reason of imports found by Commerce to be *1282 dumped). The Tariff Act provides separate procedures for initiating and conducting each type of investigation. See , e.g. , id. §§ 1671a (procedures for initiating a countervailing duty investigation), 1673a (procedures for initiating an antidumping duty investigation). In either case, it is Commerce, not the ITC, that determines the "class or kind" of imported merchandise that will be subject to investigation. See id. §§ 1671(a)(1) (countervailing duties), 1673(a)(1) (antidumping duties). The element of causation being essential to its statutorily-defined inquiry, the Commission ascertains, in the final phase of one of its investigations, whether a domestic industry (or industries, should it find multiple "domestic like products") is materially injured or threatened with material injury "by reason of" the imports that have been found by Commerce to be unfairly traded, i.e., either subsidized or dumped. See 19 U.S.C. §§ 1671d(b)(1), 1673d(b)(1). Therefore, the ITC does not make its general, final injury or threat determination based on the entire class or kind of merchandise that Commerce originally designated as subject to investigation; instead, it looks to the imports or sales (or likely sales) for importation that are subsidized (in a countervailing duty investigation) or sold at less than fair value (in an antidumping duty investigation).
In its countervailing duty investigation of hot-rolled steel from Turkey, the ITC made its clause (i) negligibility calculation using as the numerator the imports of merchandise that Commerce found to have been subsidized in its final countervailing duty determination. Views of the Commission at 13. The Commission excluded the U.S. imports of merchandise exported by Colakoglu because Commerce found these imports to have had a de minimis subsidy rate. The ITC explained its method of performing the clause (i) negligibility calculation as follows:
In Commerce's final countervailing duty determination on hot-rolled steel from Turkey, exports produced by Colakoglu received a de minimis subsidy margin. Consequently, imports from Turkey that are subject to the antidumping duty investigation are different from those subject to the countervailing duty investigation. Hot-rolled steel imports from Turkey that are subject to the antidumping duty investigation were 7.4 percent of total imports during this period and therefore were above negligible levels. Subsidized imports from Turkey (excluding exports produced by Colakoglu), however, were * * * percent of total imports during the August 2014 to July 2015 period, and thus fell below the three percent negligibility threshold for the present material injury analysis.
Id. (footnotes omitted) (asterisks indicate omission of confidential information).
1. The Statute Does Not Unambiguously Require the ITC to Base its Clause (i) Negligibility Calculation on the Volume of All Imports from the Named Country that Were Initially Subject to the Investigation
According to the primary argument Nucor makes in support of its first claim, the negligibility calculation under clause (i) differs from the general injury and threat determination made under 19 U.S.C. § 1671(b)(1), which is made on the basis of the subsidized merchandise, in that it must be made on the basis of all the merchandise originally subject to the ITC's countervailing duty investigation-in this instance, all Turkish imports of hot-rolled steel occurring during the 12-month period identified in clause (i). Relying upon "Step One" of an analysis conducted according to Chevron U.S.A., Inc. v. Nat. Resources Defense Council, Inc. , 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)
*1283 (" Chevron " ), Pl.'s Br. 9, Nucor argues that "the plain language of the statute" unambiguously requires this result. Id. at 12, 14. The court disagrees.
As the Supreme Court instructed in Chevron , when "Congress has directly spoken to the precise question at issue" and "the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron , 467 U.S. at 842-43, 104 S.Ct. 2778 (footnote omitted). Stated narrowly and precisely, the first question raised by Nucor's principal statutory construction argument is whether negligibility under clause (i) of 19 U.S.C. § 1677(24)(A), when determined in the final phase of an ITC investigation as required by 19 U.S.C. § 1671d(b)(1), is required by the plain statutory language to be calculated on the basis of all imports originally within the scope of the investigation.
The statute, in 19 U.S.C. § 1671d(b)(1), reads in pertinent part as follows:
The Commission shall make a final determination of whether ... an industry in the United States ... is materially injured, or ... is threatened with material injury ... by reason of imports ... of the merchandise with respect to which the administering authority [i.e., Commerce] has made an affirmative determination under subsection (a) of this section . If the Commission determines that imports of the subject merchandise are negligible, the investigation shall be terminated.
19 U.S.C. § 1671d(b)(1) (emphasis added). The first sentence in the provision contains a reference to the imports Commerce found to be subsidized in the completed final phase of the Department's countervailing duty investigation that precedes (and is the basis of) the final ITC determination.[7] See 19 U.S.C. § 1671d(a). The second sentence does not use the same language as the first sentence in describing the imports upon which the ITC is to make its negligibility determination under clause (i) of 19 U.S.C. § 1677(24)(A). Were the court to accept Nucor's plain meaning argument, it would have to conclude that the term "imports of the subject merchandise," as used in the second sentence, does not refer to the imports identified in the first sentence and instead is an unambiguous reference to all merchandise originally subject to the countervailing duty investigation. In support of this argument, Nucor cites the statutory definition of the term "[n]egligible imports," which is "imports from a country of merchandise corresponding to a domestic like product identified by the Commission " that "account for less than 3 percent of the volume of all such merchandise imported into the United States ...." 19 U.S.C. § 1677(24)(A)(i) (emphasis added). Nucor also cites the statutory definition of "subject merchandise," which is "the class or kind of merchandise that is within the scope of an investigation, a review, a suspension agreement, an order under this subtitle or section 1303 of this title [now repealed], or a finding under the Antidumping Act, 1921." 19 U.S.C. § 1677(25).
The court cannot conclude that the second sentence in 19 U.S.C. § 1671d(b)(1) necessarily must be read to apply to a broader category of merchandise than the merchandise described in the first sentence, which is merchandise Commerce *1284 has determined to be subsidized.[8] The definition in 19 U.S.C. § 1677(24) of "[n]egligible imports" applies not only to the question of whether "imports of the subject merchandise are negligible" under § 1671d(b)(1) ; it also applies to the question of whether "imports of the subject merchandise are negligible" under § 1671b(a)(1), which pertains to the ITC's preliminary determination (and which, if negative, results in termination of the investigation). At the time the ITC makes its preliminary determination, Commerce has not yet made any determination (preliminary or final) as to whether the imported merchandise then subject to the investigation is subsidized. Therefore, it is at least plausible that the definition of "negligible imports" in 19 U.S.C. § 1677(24) was written generally so that it could apply both to § 1671b(a)(1) and to § 1671d(b)(1). Nor does the definition of "subject merchandise" in § 1677(25), which is used in the second sentence of § 1671d(b)(1), compel the conclusion that this second sentence refers to all merchandise initially subject to investigation. The § 1677(25) definition is sufficiently broad as to apply to various phases of an investigation or review. See 19 U.S.C. § 1677(25) ( "the class or kind of merchandise that is within the scope of an investigation, a review, a suspension agreement, an order under this subtitle ... or a finding under the Antidumping Act, 1921"). At the time the ITC makes its final injury and threat determination (and, necessarily, its final clause (i) negligibility determination), Commerce already has made its subsidy determination. Moreover, merchandise Commerce has determined not to be subsidized is merchandise that, at least arguably, is by that time no longer "within the scope of" the investigation.
In summary, the text of the statute does not unambiguously require the ITC to perform its clause (i) negligibility calculation on the basis of all imports subject to the countervailing duty investigation, whether subsidized or not. The court, therefore, rejects Nucor's Chevron Step One argument. Moreover, as the court discusses in the next section of this Opinion, an analysis performed under Step One of Chevron compels a conclusion directly contrary to that advocated by Nucor.
2. Congress Intended that the ITC Would Not Base Its Clause (i) Negligibility Determination on the Volume of All Imports from the Named Country that Initially Were Subject to the Investigation
As an alternative to the Chevron Step One argument the court rejected above, Nucor makes a Chevron Step Two argument. Under Step Two of a Chevron analysis, a court will defer to an agency's reasonable interpretation of a statute the agency is charged by law to administer, even if the court might prefer a contrary interpretation. Chevron , 467 U.S at 843 & n.11, 104 S.Ct. 2778.
Nucor argues that "[e]ven if the language of the statute was [sic ] ambiguous under Chevron Step One, the interpretation offered by the Commission must fail" as unreasonable, as not "permissible under the terms adopted by the statute," and as "arbitrary and capricious." Pl.'s Br. 19 (internal citation omitted). This argument is refuted by the congressional intent underlying the negligibility provisions in the *1285 statute, as shown by the relevant legislative history. While both the ITC's interpretation and Nucor's interpretation could be plausible constructions of the statutory language, only the ITC's interpretation accords with the congressional intent. Under Chevron Step One, a court employs "the traditional tools of statutory construction," Chevron , 467 U.S. at 843 n.9, 104 S.Ct. 2778. Those tools include an examination of not only the statutory text and structure but also the legislative history. See , e.g. , Aqua Products, Inc. v. Matal , 872 F.3d 1290, 1296, 1303, 1312-14 (Fed. Cir. 2017) (en banc ); Gazelle v. Shulkin , 868 F.3d 1006, 1010 (Fed. Cir. 2017) ("We may find Congress has expressed unambiguous intent by examining the statute's text, structure, and legislative history, and apply the relevant canons of interpretation.") (internal quotation marks and citations omitted); Kyocera Solar, Inc. v. U.S. Int'l Trade Comm'n , 844 F.3d 1334, 1338 (Fed. Cir. 2016). Because Step One of a proper Chevron analysis resolves the question presented, the court does not proceed to Chevron Step Two.
The "negligibility" provisions of the countervailing and antidumping duty statute were enacted by the Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994) ("URAA"), to implement the "Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade 1994" ("Antidumping Agreement"). Id. at § 101(d)(7) (codified at 19 U.S.C. § 2511(d)(7) ). The Statement of Administrative Action ("SAA") accompanying the URAA explains that effectuating the negligibility provisions in U.S. law was accomplished by amending the following sections of the Tariff Act: sections 771(24) [ 19 U.S.C. § 1677(24), the definition of "negligibility"], 703(a) [ 19 U.S.C. § 1671b(a), negligibility in an ITC preliminary countervailing duty investigation], 705(b)(1), [ 19 U.S.C. § 1671d(b), negligibility in an ITC final countervailing duty investigation], 733(a) [ 19 U.S.C. § 1673b(a), negligibility in an ITC preliminary antidumping duty investigation], and 735(b)(1) [ 19 U.S.C. § 1673d(b), negligibility in an ITC final antidumping duty investigation]. Uruguay Round Agreements Act: Statement of Administrative Action , H.R. Doc. No. 103-316, vol. 1 at 855 (1994) ("SAA" ), reprinted in 1994 U.S.C.C.A.N. 4040, 4187-88.
The SAA states that "[t]he Agreements require termination of investigations if the investigating authority determines that the volume of dumped or subsidized imports is negligible." Id. (emphasis added). In this way, the SAA reveals the purpose of the new provisions, which was to implement a requirement to which the United States agreed in international negotiations. Nucor's primary statutory construction argument-that the ITC is required by the statute to base its clause (i) negligibility calculation on the volume of all imports of merchandise originally subject to the countervailing duty investigation-is contradicted by this statement of congressional purpose. Further, Article 5.8 of the Anti-dumping Agreement reached in the Uruguay Round negotiations provides that "[t]here shall be immediate termination in cases where ... the volume of dumped imports, actual or potential, or the injury, is negligible" and that "[t]he volume of dumped imports shall normally be regarded as negligible if the volume of dumped imports from a particular country is found to account for less than 3 per cent of the imports of the like product in the importing Member, unless countries which individually account for less than 3 per cent of the imports of the like product in the importing Member collectively account for more than 7 per cent of imports of the like product in the importing Member." Anti-dumping Agreement, Art. 5.8 (emphasis *1286 added). Although there is no parallel provision in the Uruguay Round agreement on subsidies, the SAA mentions that "the 'three percent' definition of negligible imports appears only in the Antidumping Agreement" but clarifies that as effected in U.S. law, "the definition of negligible imports in new section 771(24) [ 19 U.S.C. § 1677(24) ] will be applicable to both antidumping and countervailing duty investigations." SAA at 855, reprinted in 1994 U.S.C.C.A.N. 4040, 4188. Other legislative history of the URAA is consistent with the SAA in explaining that the clause (i) negligibility analysis is performed on the basis of the volume of dumped or subsidized imports. Report of the House Committee on Ways and Means to Accompany H.R. 5110, Rep. No. 103-826 (1994) at 71 ("House Report").
In summary, Congress did not intend for the ITC to perform its clause (i) negligibility calculation on the basis of all imports from the named country that initially were subject to the countervailing duty investigation.
3. The Statute Does Not Allow the ITC to Base the Clause (i) Negligibility Calculation on the Volume of All Unfairly Traded Imports from the Named Country
Nucor's next argument, which the court addresses as an argument in the alternative,[9] is that even were the statute construed not to require the ITC to base the clause (i) negligibility calculation on all imports from the named country originally subject to the countervailing duty investigation, the ITC still must be held to have acted contrary to law in basing that calculation only on the subsidized imports rather than on all Turkish imports found by Commerce to have been unfairly traded, i.e., either dumped or subsidized, in the parallel CVD and AD investigations. Pl.'s Br. 14 (arguing that "[i]n no uncertain terms, the statute requires the Commission to consider all in-scope, unfairly traded merchandise in its negligibility analysis" and that "[t]here is no basis under the statute for the Commission's separate AD and CVD negligibility analysis, nor for the exclusion of Colakoglu's imports."). Because the volume of Turkish imports Commerce determined to be dumped amounted to 7.4% of the total volume of U.S. imports from all countries, the ITC did not terminate the parallel antidumping duty investigation of hot-rolled steel from Turkey on the basis of negligible imports. The alternate construction of the statute Nucor urges upon the court would preclude the Commission's termination of the countervailing duty investigation as well, based on the volume of imports Commerce found to have been dumped.
In support of its alternate statutory construction argument, Nucor again points to 19 U.S.C. § 1677(24), which provides that "imports from a country of merchandise corresponding to a domestic like product identified by the Commission are 'negligible' if such imports account for less than 3 percent of the volume of all such merchandise imported into the United States" in the relevant 12-month period. 19 U.S.C. § 1677(24)(A)(i) (emphasis added). According to Nucor, "[t]his plain language thus *1287 requires the Commission to analyze all unfairly traded merchandise in determining whether the imports in question are negligible." Pl.'s Br. 14.
Nucor's alternate argument does not withstand scrutiny upon examination of the statutory language and structure. The congressional directive is that "[i]f the Commission determines that imports of the subject merchandise are negligible, the investigation shall be terminated." 19 U.S.C. § 1671d(b)(1) (emphasis added). The directive of § 1671d(b)(1) pertains solely to a countervailing duty investigation that is initiated according to § 1671a ("Procedures for initiating a countervailing duty investigation") and that was continued upon an affirmative determination by the Commission under § 1671b(a). Nucor's construction of § 1671d(b) awkwardly would read the term "subject merchandise" to refer to merchandise beyond the merchandise that is "subject" to the investigation being considered for termination. It would do this even though § 1671d(b)(1) makes no mention of a parallel antidumping duty investigation (which is initiated under 19 U.S.C. § 1673a ("Procedures for initiating an antidumping duty investigation") ). Nor is there any such reference elsewhere within § 1671d or in § 1671b. The statute provides separate procedures for CVD investigations (in Part I of Subtitle IV of the Tariff Act) and for AD investigations (in Part II of Subtitle IV) and does not provide for anything that could be termed a "countervailing and antidumping duty investigation."
Nucor's reliance on 19 U.S.C. § 1677(24), the definitional provision for "negligible imports," which applies to both the CVD investigations of Part I and the AD investigations of Part II, is misplaced. As the court discussed previously in this Opinion, the breadth of the definition in § 1677(24)(A) allows the definition to apply flexibly to various provisions in the statute. It applies not only to the ITC's final determinations in countervailing or antidumping duty investigations, but also to the ITC's preliminary determination in a countervailing duty investigation ( 19 U.S.C. § 1671b(a)(1) ) and to its preliminary determination in an antidumping duty investigation ( 19 U.S.C. § 1673b(a)(1) ). In both of the latter instances, Commerce has not yet made a final determination on whether the imports subject to the investigation are unfairly traded, i.e., subsidized or dumped, respectively. Procedurally, Commerce provided for separate ITC negligibility determinations in each of the four provisions implicating the definition of "negligible imports," calling for distinct CVD and AD negligibility determinations at both the preliminary and final stages of the investigation.
Moreover, Nucor's alternate statutory construction argument is difficult to reconcile with subpart (B) of § 1677(24), in which Commerce provided for a different method of determining negligibility under clause (i) in a countervailing duty investigation than it did for an antidumping duty investigation. In CVD investigations, but not AD investigations, the clause (i) negligibility threshold is "less than 3 percent" in the ordinary instance, § 1677(24)(A)(i), but is modified to less than "4 percent" by operation of subpart (B) when the "subject merchandise" is from "developing countries." § 1677(24)(B). Congress was specific in applying the latter "[i]n the case of an investigation under section 1671 of this title," i.e., a countervailing duty investigation, and made no parallel provision applicable to antidumping duty investigations under section 1673. Subpart B of § 1677(24) uses the term "subject merchandise" in a way that must be read to refer solely to the merchandise that is subject to the particular countervailing duty investigation, not a related antidumping investigation.
*1288 The legislative history is also contrary to Nucor's interpretation. The SAA states that "[t]he Agreements require termination of investigations if the investigating authority determines that the volume of dumped or subsidized imports is negligible." SAA at 855, reprinted in 1994 U.S.C.C.A.N. 4040, 4187 (emphasis added); see also House Report at 71 ("Article 5.8 requires termination of investigations if the investigating authority determines that the volume of dumped or subsidized imports is negligible.") (emphasis added). A reading of "or" to mean "and" would be a strained interpretation, at the least. Article 5.8 of the Anti-dumping Agreement, which the court discussed previously, shows that such an interpretation could not have been intended. Article 5.8 provides unambiguously that "[t]here shall be immediate termination in cases where the authorities determine that the margin of dumping is de minimis , or that the volume of dumped imports, actual or potential, or the injury, is negligible." Anti-dumping Agreement, Art. 5.8. Nucor's interpretation of the statute to require the result it seeks in this case, continuation of the countervailing duty investigation despite negligible subsidized imports, necessarily also would require the ITC to refrain from terminating an antidumping duty investigation in a case in which the volume of dumped imports is negligible, so long as the volume of subsidized imports in a parallel countervailing duty investigation is not negligible. Such a result would contravene the plain meaning and purpose of Article 5.8, the provision in the Anti-dumping Agreement the URAA was implementing.
Nucor raises various additional arguments in an attempt to demonstrate that the ITC's separate negligibility determination in the CVD investigation of hot-rolled Turkish steel was unlawful. The court is not persuaded by these arguments.
Nucor alludes to "the Tariff Act's purpose and policy goals," Pl.'s Br. 16-21, supporting its argument with a discussion of the purposes of the cumulation provisions in the statute and of the legislative history of the negligibility exception to cumulation that existed in the statute prior to the amendment by the URAA. Id. at 17-18. Nucor fails to show any relevance of those previous negligibility provisions to the issue Nucor raises as to current law.
Nucor also argues that in the past the Commission has combined subsidized and dumped imports in performing the negligibility calculation under clause (i) and that, accordingly, the court should not accord the ITC's interpretation Chevron deference. Id. at 21-25. The ITC's applications of the negligibility provisions in past investigations, whether or not inconsistent with its decision in this case, do not change the court's conclusion. As discussed above, Congress intended for the ITC to make the clause (i) negligibility determination individually in a countervailing duty investigation, on the basis of the imports Commerce found to be subsidized. The court, therefore, rejects both of Nucor's statutory construction arguments and sustains according to Step One of a Chevron analysis the ITC's interpretation of the statute, under which ITC conducts separate negligibility determinations in the case of parallel CVD and AD investigations, as it did in the parallel investigations of hot-rolled steel from Turkey. The question of whether the Commission's statutory interpretation is to be accorded deference under Step Two of a Chevron analysis does not arise.
4. The Court Declines to Remand the Final Determination for Additional Explanation of the Commission's Statutory Construction of the Clause (i) Negligibility Provision
Nucor argues that the Commission's clause (i) negligibility determination must *1289 be set aside because the Commission failed to respond to arguments made before it on the correct interpretation of the negligibility provision. Pl.'s Br. 25. Specifically, Nucor directs the court's attention to an argument ArcelorMittal USA LLC and AK Steel Corporation made during the agency proceeding: "The relevant statute provides that the Commission should consider 'imports from a country of merchandise corresponding to a domestic like product' in calculating negligibility .... This language plainly covers all subject imports, whether dumped or subsidized." Id. (quoting AK Steel Corporation's Post-Hearing Brief (P.R. Doc. 404) at 14, n.70 and citing ArcelorMittal USA LLC's Post-Hearing Br. (P.R. Doc. 394) at 14 and AK Steel Corporation's Final Comments (P.R. Doc. 446) at 14-15).
In Nucor's view, the ITC violated the statutory requirement "to include in its final determination 'an explanation of the basis for its determination that addresses relevant arguments that are made by interested parties who are parties to the investigation ... concerning volume, price effects, and impact on the industry of imports of the subject merchandise'-issues to which the negligibility analysis pertains directly." Pl.'s Br. 25 (quoting 19 U.S.C. § 1677f(i)(3)(B) ). Because it includes a reference to "volume ... of imports," 19 U.S.C. § 1677f(i)(3)(B) plausibly can be construed to apply to the argument Nucor quotes. Therefore, in considering Nucor's argument the court presumes, without deciding, that § 1677f(i)(3)(B) applies in the situation presented. The ITC addressed the argument in question in a footnote, which in pertinent part reads as follows:
Domestic producers recognize that Commerce issued a de minimis final subsidy margin for Turkish producer Colakoglu but argue that Turkish imports are above the three percent threshold and thus are not negligible.... ArcelorMittal also urges the Commission to "follow its practice in Certain Oil Country Tubular Goods from India, et al. , where it made a single negligibility calculation for Turkey using the total volume of imports from the country-and not separate AD and CVD negligibility calculations-though one Turkish producer received a zero margin in the AD case." ArcelorMittal Posthearing Brief at 14 n.13. The Commission's opinion in that case, however, did not purport to address that issue.
Views of the Commission at 13 n.52. Nucor is correct that the ITC did not provide the reasoning underlying its statutory construction of the clause (i) negligibility provision that it has presented before the court. Nevertheless, the court disagrees with Nucor's argument that the negligibility determination under clause (i) must be set aside for lack of an adequate explanation and remanded to the Commission.
ArcelorMittal and AK Steel raised the statutory construction argument during the ITC investigation in only a cursory way, alluding in one sentence to a single phrase within 19 U.S.C. § 1677(24) without providing an analysis of that provision or how it relates to other statutory provisions to compel their conclusion that the ITC misinterpreted the statute. It is fair to say that the statutory construction arguments Nucor makes to the court were not fully presented below for purposes of satisfying the requirement to exhaust administrative remedies. See 28 U.S.C. § 2637(d) (directing the Court to require the exhaustion of administrative remedies, where appropriate). On the other hand, the Commission's cursory dismissal of the argument made before it arguably did not fulfill the requirement in 19 U.S.C. § 1677f(i)(3)(B) because it failed to raise the defense, i.e., the *1290 statutory interpretation, that the Commission advocates before the court.
Even though the Commission's decision failed to develop fully and explain the Commission's position on the statutory interpretation issue involving clause (i), the court sees no purpose that would be served by remanding that decision to the Commission for a redetermination or a further explanation. Although neither the domestic producers nor the defendant ITC fully developed their respective positions on this issue (which is a pure question of law) during the Commission's investigation, both sides have taken the full opportunity to present their arguments in their submissions to the court in this proceeding.
D. The Commission's Determination that Imports of Subsidized Hot-Rolled Steel from Turkey Were Unlikely to Imminently Exceed the 3% Statutory Threshold is Supported by Substantial Evidence on the Record
1. The Exception to Negligibility under 19 U.S.C. § 1677(24)(A)(iv) ( "Clause (iv)")
Clause (iv) of 19 U.S.C. § 1677(24)(A) creates an exception to negligibility under clause (i), as follows:
[T]he Commission shall not treat imports as negligible if it determines that there is a potential that imports from a country described in clause (i) will imminently account for more than 3 percent of the volume of all such merchandise imported into the United States, or that the aggregate volumes of imports from all countries described in clause (ii) will imminently exceed 7 percent of the volume of all such merchandise imported into the United States. The Commission shall consider such imports only for purposes of determining threat of material injury.
19 U.S.C. § 1677(24)(A)(iv). Nucor claims that the Commission's finding under clause (iv), that there was no potential that imports of subsidized hot-rolled steel from Turkey would imminently exceed 3% of total U.S. imports, was unsupported by substantial evidence and otherwise not in accordance with law. Pl.'s Br. 27 (citing Views of the Commission at 13-14).
2. The Commission's Negative Clause (iv) Determination
The Commission summarized its negative clause (iv) determination as follows:
We find that the sporadic pattern of imports from the Turkish producers subject to the countervailing duty investigation, combined with their consistently relatively small share of total Turkish hot-rolled steel imports, increasing capacity utilization, and strong home-market orientation, demonstrate that any sustained increase in the percentage of subsidized subject imports from Turkey relative to all imports is unlikely. Therefore, the record supports a conclusion that there is not a potential that subsidized subject imports from Turkey will imminently exceed three percent of total imports.
Views of the Commission at 14.
3. Nucor's Arguments Challenging the ITC's Negative Clause (iv) Determination
In contesting the Commission's clause (iv) determination, Nucor argues that "[t]he Commission based its determination on flawed factual considerations, and it insufficiently addressed significant evidence on the record indicating that these Turkish imports were likely to imminently exceed the negligibility threshold." Pl.'s Br. 2-3. Specifically, Nucor summarizes its arguments by asserting, first, that "[t]he Commission's finding that these Turkish *1291 imports were 'sporadic' was not supported by the record, which showed significant volumes of such imports in increasing amounts, both absolutely and as a share of total hot-rolled steel imports." Pl.'s Br. 3. Second, Nucor argues that "[t]he Commission's assertion that non-Colakoglu Turkish imports show a 'strong home-market orientation' is similarly unsupported and fails to account for substantial contradictory evidence showing the export-oriented nature of Turkish producers." Id. Third, Nucor argues that "the Commission impermissibly ignored increases in inventories of hot-rolled steel in the Turkish industry excluding Colakoglu in reaching its determination." Id. The court rejects these arguments, as discussed below.
4. Substantial Record Evidence Supported the ITC's Finding of "Sporadic" Imports
The Commission expressed its finding that the subsidized imports of hot-rolled steel from Turkey were "sporadic" as follows: "On a monthly basis the volume of subject imports from Turkey subject to the countervailing duty investigation as well as their percentage of total imports were sporadic, including in the period prior to the filing of the petition." Views of the Commission at 13 (footnotes omitted). In support, the Commission referred specifically to "Table H-1," Consolidated Final Staff Report to the Commission, Certain Hot-Rolled Steel Flat Products from Australia, Brazil, Japan, Korea, the Netherlands, Turkey, and the United Kingdom , Inv. Nos. 701-TA-545-547 and 731-TA-1291-1297 (Final) (Sept. 28, 2016) (C.R. Doc. 604) ("Staff Report") at H-3, which presents monthly data on the share that subsidized Turkish imports occupied of total U.S. imports.[10] See also Views of the Commission at 13-14 n.54.
Discussing Table H-1, Nucor argues that "[t]he volumes of relevant Turkish imports, both on an absolute basis and as a share of total U.S. hot-rolled steel imports ... contradict the Commission's conclusion that such imports were 'sporadic.' " Pl.'s Br. 28. Rather than being "sporadic," Nucor claims that "hot-rolled steel imports from Turkey, excluding those from Colakoglu, were significant and substantially increasing during the POI." Id. The court disagrees. Table H-1 supports the Commission's characterization of the subsidized imports from Turkey as sporadic. Import volumes are shown for 39 months (all 12 months of 2013, 2014 and 2015, and the first three months of 2016). For 27 or 28 of the 39 months shown in Table H-1, the monthly import volumes of subsidized Turkish imports, as a percentage of the volume of total U.S. imports of hot-rolled steel, can be fairly described as miniscule. While volumes of subject Turkish imports as shown in Table H-1 were relatively higher during some periods, it would not be accurate to assert that they were consistently significant. Similarly, while the data in Table H-1 (and in the related Table H-2, Staff Report at H-4) show an increase in subject Turkish imports during the POI, the court is not persuaded by Nucor's characterization of the increase as "substantial."
An analysis of the monthly volume data, shown in Table H-2, demonstrates that for moving 12-month periods over the course of the period of investigation, the average annual volume of the subsidized Turkish imports did not reach, or even come very close to reaching, the clause (iv) threshold *1292 of 3% of total U.S. imports of hot-rolled steel. See Table H-2, Staff Report at H-4. Moreover, as the ITC points out before the court, "the simple fact is that the statute requires that the share will imminently exceed three percent, not that it will 'nearly reach' this threshold." Def.'s Opp'n to Pl.'s Mot. for J. on the Agency Record, 31 (July 13, 2017), ECF No. 52 ("Def.'s Br."). In summary, the data set forth in Tables H-1 and H-2 demonstrate that the Commission's finding that subsidized Turkish imports were "sporadic" during the POI is supported by substantial evidence based on the record as a whole. The Commission reasonably concluded that these data supported the ultimate finding that "any sustained increase in the percentage of subsidized subject imports from Turkey relative to all imports is unlikely." Views of the Commission at 14.
Nucor's argument that the ITC's "sporadic" finding ignored evidence that "[h]ot-rolled steel imports from Turkey, excluding those from Colakoglu, were significant and substantially increasing during the POI," Pl.'s Br. 28, is also unavailing. Citing Table H-3, Staff Report at H-5, which was compiled from the questionnaire data of the Turkish producers, Nucor selectively focuses its attention on certain isolated record data showing a large percentage increase in the subsidized exports to the United States from Turkey from 2013 to 2015. Pl.'s Br. 33. Nucor also selectively points to significant increases in subsidized imports to the U.S. during particular subsets of the relevant 12-month period, drawing data from Tables H-1 and H-2, Staff Report at H-3 and H-4, respectively. See Pl.'s Br. 30-32. Nucor claims these increases are "persuasive evidence that these imports would imminently exceed the 3-percent threshold." Id. 32-33 (internal citation omitted). The increases Nucor mentions, however, are from very small bases. Increases from such insubstantial bases are minimally probative when viewed in the context of all the data presented in Tables H-1, H-2, and H-3, which amply support the ITC's finding that "the record supports a conclusion that there is not a potential that subsidized subject imports from Turkey will imminently exceed three percent of total imports." Views of the Commission at 14.
5. The ITC Permissibly Found that Turkish Producers Other than Colakoglu Had a "Strong Home Market Orientation"
The ITC concluded from record data that the shipments of the Turkish hot-rolled steel producers subject to the CVD investigation (i.e., those other than Colakoglu) "were overwhelmingly to the home market" and had a "strong home-market orientation." Views of the Commission at 14 (footnote omitted). While disputing the characterization of a "strong home-market orientation," Nucor does not cite evidence rebutting the specific finding that subsidized Turkish hot-rolled steel shipments were "overwhelmingly" to the domestic Turkish market, a finding the record data, compiled from questionnaires of the Turkish producers, entirely supports. See Table H-3, Staff Report at H-5.
In contesting the finding of a "strong home-market orientation," Nucor argues that the Commission ignored relevant evidence, including evidence that "the percentage of relevant shipments that were sold in the home market actually decreased slightly over the relevant period." Pl.'s Br. 33. The slight decrease does not detract in any meaningful way from the finding that the shipments in question went overwhelmingly to the domestic market. Also, according to Nucor there is "comprehensive evidence showing that Turkish exports are focused on the United States as a top destination market." Pl. Nucor Corporation *1293 and Pl.-Intervenors ArcelorMittal USA LLC, AK Steel Corporation, and United States Steel Corporation's Reply Brief, 21 (Aug. 11, 2017), ECF Nos. 57 (confidential), 58 (public) ("Pl.'s Reply Br."). Nucor asserts that "the United States is one of the most attractively priced markets for Turkish imports" and that "Turkish producers have been increasingly affected by difficult home market conditions and third-country trade barriers." Id. (internal citation omitted). These subjective characterizations of the record do not refute the conclusions the ITC drew from the quantitative record evidence. Also, Nucor alludes to data on hot-rolled steel exports to the United States that include exports by Colakoglu, Pl.'s Br. 34-35, which Commerce found not to be subsidized. In summary, all of these arguments are unavailing: the producers' questionnaire data summarized in Table H-3 amply demonstrate not only that the Turkish exporters subject to the CVD investigation produced predominantly for the home market but also that the relatively small portion of their production they did export went predominantly to export markets other than the United States during the POI. Based on the court's review, the Commission's finding of a "strong home-market orientation" is well supported by substantial evidence both in the Table H-3 data and the record as a whole.
6. Nucor's Argument that the ITC Disregarded Inventory Data
Nucor argues that "[d]espite its statement that it typically examines inventories in its 'imminently exceed' analysis ... the Commission entirely disregarded the absolute and relative increases in inventories of Turkish hot-rolled steel excluding Colakoglu's products from 2013 to 2015." Pl.'s Br. 38 (citing Views of the Commission at 13 n.53 and Table H-3, Staff Report at H-5.).[11] Nucor submits that the ITC's failure to consider the inventories as a factor, in combination with other shortcomings it alleges, renders the Commission's clause (iv) determination unsupported by substantial evidence. Id. at 38-39. This argument is meritless.
Table H-3, Staff Report at H-5, presents end-of-year inventory data of the Turkish producers other than Colakoglu for 2013, 2014, and 2015 and end-of quarter inventories for the first quarters of 2015 and 2016, i.e., January to March, based on data submitted in response to the Commission's questionnaires. The Table H-3 data show that total inventories decreased, then increased, then decreased, from year-end 2013 through March 2016. The quantity of total inventories at the end of that two-year-plus-one-quarter period did not vary significantly from the total inventories at the beginning of the period. And as the Commission pointed out in its response brief to the court, "the combined subject Turkish producers' reported end-of-period inventory levels as a share of production and as a share of total shipments were relatively low, fluctuating within a fairly narrow band ... during the period of investigation." Def.'s Br. 35 (citing Table H-3, Staff Report at H-5).
The court cannot conclude that the Commission "disregarded" the inventory data in the Staff Report. To the contrary, it is understandable why the Commission did not see a need to mention the inventory data in Views of the Commission : even if viewed in isolation, these inventory data would not support a finding that the volume of subsidized imports have the potential imminently to account for more than *1294 3% of the volume of all U.S. hot-rolled steel imports. This is all the more apparent when the inventory data are viewed in the context of the record data showing that the production of the Turkish producers other than Colakoglu went predominantly to the domestic market and the data showing that their export shipments went predominantly to markets other than the United States.
7. Nucor's Remaining Argument Lacks Merit
While not specifically including it in the summary of its arguments, Pl.'s Br. 3, Nucor adds an argument in the body of its brief. The court rejects this argument for the reasons that follow.
Nucor objects to the ITC's finding that subsidized Turkish imports constituted "a relatively small share of total Turkish exports to the U.S. market from 2013 to 2015." Views of the Commission at 14 (footnote omitted); see also Pl.'s Br. 29. Plaintiff claims this conclusion is "erroneous," Pl.'s Br. 29, and argues that, in any case, "the Commission's focus on the size of the share of non-Colakoglu [i.e. subsidized] imports compared to total Turkish imports was arbitrary and misplaced." Id. 30. This argument is unpersuasive.
Nucor is correct that 19 U.S.C. § 1677(24)(A)(iv) bases its negligibility analysis on whether "there is a potential that imports from a country described in clause (i) [i.e., 'imports from a country of merchandise corresponding to a domestic like product'] ... will imminently account for more than 3 percent of the volume of all such merchandise imported into the United States." That does not mean that it was "arbitrary" or "misplaced" for the ITC to address additional evidence regarding subsidized Turkish imports among its various findings. Nor was it "erroneous," on that evidence, for the Commission to find that the share of subsidized Turkish imports as a percentage of total Turkish imports into the U.S. was "relatively small," Views of the Commission at 14. See Tables VII-25 and H-1, Staff Report at VII-39 and H-3, respectively. Based on the court's review, substantial record evidence supports this finding. The court, therefore, determines that the Commission permissibly considered trends in subsidized Turkish imports as a percentage of total Turkish imports into the United States.
III. CONCLUSION
The court holds that the ITC did not misinterpret the statutory provisions governing the negligibility determination under clause (i) of 19 U.S.C. § 1677(24)(A). The court also holds that substantial evidence supports the factual findings Nucor challenged in contesting the Commission's negative threat determination under clause (iv) of that provision. Because the Commission correctly construed the statute in determining that subsidized Turkish imports of hot-rolled steel were negligible under clause (i) and permissibly found that the exception to negligibility in clause (iv) did not apply, the court sustains the Commission's termination of the countervailing duty investigation of hot-rolled steel from Turkey. The court, therefore, will deny Nucor's motion for judgment on the agency record and, pursuant to USCIT Rule 56.2, will enter judgment for defendant.

This Opinion contains no confidential information. Public documents and public versions of confidential documents from the administrative record are cited as "P.R. Doc. ___". Where necessary, confidential documents from the administrative record are cited as "C.R. Doc. ___".

The ITC designated the countervailing duty investigations as Investigation Nos. 701-545 (Brazil), 701-546 (Korea), and 701-547 (Turkey). The antidumping duty investigations were Investigation Nos. 731-1291 (Australia), 731-1292 (Brazil), 731-1293 (Japan), 731-1294 (Korea), 731-1295 (the Netherlands), 731-1296 (Turkey), and 731-1297 (United Kingdom). See Int'l Trade Comm'n, Antidumping and Countervailing Duty Orders in Place As of February 14, 2018, available at https://www.usitc.gov/sites/default/files/trade_remedy/documents/orders.xls (last visited Feb. 21, 2018).

The court addresses in this Opinion the arguments presented by plaintiff Nucor. Plaintiff-intervenors joined in each of these arguments and did not submit separate briefs. Counsel for plaintiff-intervenor ArcelorMittal USA LLC appeared at oral argument but deferred to the arguments made by Nucor. The remaining plaintiff-intervenors did not appear at oral argument.

Citations to the Tariff Act of 1930 in this Opinion are to the relevant portions of Title 19 of the U.S. Code, 2012 edition.

The general definition of "negligible" is subject to an exception set forth in clause (ii) of 19 U.S.C. § 1677(24)(A), under which "[i]mports that would otherwise be negligible under clause (i) shall not be negligible if the aggregate volume of imports of the merchandise from all countries described in clause (i) with respect to which investigations were initiated on the same day exceeds 7 percent of the volume of all such merchandise imported into the United States during the applicable 12-month period." 19 U.S.C. § 1677(24)(A)(ii) ("clause (ii)"). Nucor does not assert a claim as to clause (ii).

The Tariff Act also refers to a final ITC determination of whether "the establishment of an industry in the United States is materially retarded." 19 U.S.C. §§ 1671d(b)(1)(B) (countervailing duties), 1673d(b)(1)(B) (antidumping duties). Material retardation of the establishment of a domestic industry was not at issue in this case.

If Commerce, in the final phase of its countervailing duty investigation, finds that a countervailable subsidy is not being provided with respect to the subject merchandise, it terminates the investigation, and as a result the ITC does not make a final injury or threat determination. 19 U.S.C. § 1671d(c)(2).

In support of the argument it grounds in 19 U.S.C. §§ 1677(24) and 1677(25), Nucor cites Kyocera Solar, Inc. v. United States Int'l Trade Comm'n , 844 F.3d 1334, 1339-40 (Fed. Cir. 2016). In contrast to this case, Kyocera involved the issue of whether the ITC must conduct two separate, country-specific negligibility analyses when the subject merchandise is further processed in, and imported from, a country other than the named country.

In its Rule 56.2 brief, Nucor conflated what are essentially two separate statutory construction arguments. In response to the court's observation at oral argument that Nucor appeared to be making two arguments in the guise of one, Nucor indicated that the court should review its argument that ITC should have combined all unfairly traded, i.e., the dumped and the subsidized, import volumes as an alternative to its argument that the statute required negligibility to be determined on the basis of all merchandise originally subject to investigation, whether or not found to be unfairly traded. Oral Argument (Jan. 18, 2018), ECF No. 70.

Table H-1 presents data designated by the Commission as confidential. Because citing the specific data in this table and other confidential data in the record is not necessary to a public explanation of the court's conclusions, the court limits its discussion to general summaries of, and trends shown by, the data rather than specific items of data.

The brief actually cites the Staff Report "at H-5 (Table H-5)." Id. Because there is no "Table H-5" on the record, and because Table H-3 appears on page H-5 of the Staff Report, the court construes the citation to be to Table H-3.