Slip Op. 25-160

# UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr><td>

WABTEC CORPORATION,

        Plaintiff,

    and

STRATO, INC.,

        Plaintiff-Intervenor,

    v.

UNITED STATES,

        Defendant,

    and

COALITION OF FREIGHT COUPLER PRODUCERS,

        Defendant-Intervenor.

</td><td>

**Before: Gary S. Katzmann, Judge**
**Court No. 23-00160 &**
**Court No. 23-00161**

</td></tr>
</table>

## OPINION AND ORDER

[ The U.S. Department of Commerce's determinations are remanded in part. ]

Dated: <u>December 23, 2025</u>

<u>David M. Morrell</u>, Jones Day, of Washington, D.C., argued for Plaintiff Wabtec Corporation. With him on the brief were <u>Ryan M. Proctor</u> and <u>Shelbie M. Rose</u>.

<u>Andrew T. Schutz</u>, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, D.C. and New York, N.Y., for Plaintiff-Intervenor Strato, Inc. With him on the briefs were <u>Michael S. Holton</u>, <u>Jordan C. Kahn</u>, and <u>Ned H. Marshak</u>.

<u>Emma E. Bond</u>, Trial Attorney, Commercial Litigation Branch, U.S. Department of Justice of Washington, D.C. argued for Defendant United States. With her on the briefs were <u>Brian M. Boynton</u>, Principal Deputy Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, and <u>Claudia Burke</u>, Deputy Director. Of counsel on the briefs were <u>Ashlande Gelin</u>, Attorney and <u>Benjamin Juvelier</u>, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance,

U.S. Department of Commerce, of Washington, D.C.

Daniel B. Pickard and Claire M. Webster, Buchanan Ingersoll & Rooney PC, of Washington, D.C., argued for Defendant-Intervenor Coalition of Freight Coupler Producers.  With him on the briefs were Amanda L. Wetzel.

Katzmann, Judge:    The U.S. Department of Commerce ("Commerce") and the International Trade Commission ("the Commission") have distinct roles in antidumping and countervailing duty investigations: Commerce determines whether to initiate an investigation, 19 U.S.C. §§ 1673a, 1671a, and whether goods are being sold at less-than-fair value in an antidumping duty investigation, id. § 1673d(a)(1), or whether a countervailable subsidy is being provided in a countervailing duty investigation, id. § 1671d(a)(1); the Commission separately determines whether the domestic industry is experiencing or is threatened with material injury, id. §§ 1673d(b)(1), 1671d(b)(1).  Plaintiff Wabtec Corporation ("Wabtec") and Plaintiff-Intervenor Strato, Inc. ("Strato") brought challenges to both Commerce and the Commission's final determinations in antidumping and countervailing duty investigations of freight rail couplers ("FRCs"), the components that connect freight train cars, from the People's Republic of China ("China") and Mexico.  See Compl., Wabtec Corp. v. United States, 49 CIT __, 2025 WL 2945805 (Oct. 8, 2025) ("Wabtec I"), Sept. 13, 2023, ECF No. 9; Compl., Wabtec Corp. v. United States, No. 23-cv-00160 (U.S. Ct. Int'l Trade filed Aug. 14, 2023) ("Wabtec II"), Sept 13, 2023, ECF No. 9; Compl., Wabtec Corp. v. United States, No. 23-00161 (U.S. Ct. Int'l Trade filed Aug. 14, 2023) ("Wabtec III"), Sept. 13, 2023, ECF No. 10.

As a result of Plaintiffs' challenge to the Commission's final affirmative injury determination in Wabtec I, the court previously remanded the Commission's affirmative injury determination.  See Wabtec I, 2025 WL 2945805, at *16 (remanding to reconsider whether to exclude Amsted Rail Co., Inc.—a company that both produces domestic FRCs and imports Mexican FRCs—from the domestic industry when determining if the domestic industry was

materially injured by reason of imports from China and Mexico). The court now considers Plaintiffs' separate challenges to Commerce's final affirmative determinations regarding FRCs from China[1]—one challenging Commerce's final affirmative antidumping determination ("Wabtec II"), see Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China: Final Affirmative Determination of Sales at Less-Than-Fair Value and Final Affirmative Determination of Critical Circumstances, 88 Fed. Reg. 34485, 34485 (Dep't Com. May 30, 2023), Wabtec II P.R. 231[2] ("FRC II Final Antidumping Determination"), and another challenging Commerce's final affirmative countervailing duty determination ("Wabtec III"), see Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination, In Part, 88 Fed. Reg. 32184, 32184 (Dep't Com. May 19, 2023), Wabtec III P.R. 309 ("FRC II Final Countervailing Determination").[3]

As a result of investigations of FRCs from China and Mexico ("FRC II"), Commerce determined that "certain [FRCs] and parts thereof . . . from [China were] being, or [were] likely to be, sold in the United States at less[-]than[-]fair value" between January 1, 2022 and June 30, 2022, FRC II Final Antidumping Determination, 88 Fed. Reg. at 34485, and that "countervailable

---

[1] While the relevant investigations covered imports from both China and Mexico, Wabtec and Strato here challenge only Commerce's antidumping and countervailing duty determinations with respect to China. See Compl., Wabtec II, Sept 13, 2023, ECF No. 9; Compl., Wabtec III, Sept. 13, 2023, ECF No. 9.

[2] All citations to the public and confidential records are to the joint appendices in both Wabtec II and Wabtec III and are accordingly labeled either "Wabtec II P.R." or "Wabtec III P.R." Where the same documents appear in both joint appendices, P.R. numbers refer to the Wabtec II joint appendix.

[3] The court joined Plaintiffs' challenges to Commerce's antidumping and countervailing determinations in Wabtec II and Wabtec III for hearing and decision. Order Joining Cases, Wabtec II, Nov. 22, 2023, ECF No 31; Order Joining Cases, Wabtec III, Nov. 22, 2023, ECF No. 31.

subsidies [were] being provided to producers and exporters of certain [FRCs] and parts thereof . . . from [China]" between January 1, 2021 and December 31, 2021, FRC II Final Countervailing Determination, 88 Fed. Reg. at 32184. Commerce had previously conducted investigations of FRCs from China covering a period of investigation of January 1, 2021 through June 30, 2021 for the antidumping duty investigation, and January 1, 2020 through December 31, 2020 for the countervailing duty investigation ("FRC I"). See generally Freight Rail Coupler Systems and Certain Components Thereof From the People's Republic of China: Final Affirmative Determination of Sales at Less-Than-Fair Value, 87 Fed. Reg. 32121 (Dep't Com. May 27, 2022) ("FRC I Final Antidumping Determination"); Freight Rail Coupler Systems and Certain Components Thereof From the People's Republic of China: Final Affirmative Countervailing Duty Determination, 87 Fed. Reg. 30869 (Dep't Com. May 20, 2022) ("FRC I Final Countervailing Determination"). As a result of FRC I, Commerce determined that imports from China were sold at less-than-fair value and were subsidized. See FRC I Final Antidumping Determination, 87 Fed. Reg. at 32121; FRC I Final Countervailing Determination, 87 Fed. Reg. at 30869.

Wabtec and Strato move for judgment on the agency record, asserting that (1) Commerce unlawfully permitted the petitioner to relitigate the final determinations in FRC I and (2) Commerce erred in refusing to exclude FRCs attached to railcars from the scope language. See generally Pl.'s Mot. for J. on the Agency R., Jan. 22, 2024, ECF No. 32 ("Pl.'s Br."); Plaintiff-Intervenor's Mot. for J. on the Agency R., Feb. 5, 2024, ECF No. 35 ("Pl.-Inter.'s Br.").[4] The court concludes that (1) Commerce did not improperly permit relitigation of FRC I and (2) Commerce erred in disclaiming any authority to modify the scope language based on the alleged lack of any cognizable injury. As a result, the court remands the FRC II Final Antidumping

---

[4] Because the briefing and materials in both Wabtec II and Wabtec III are substantially identical, all citations are to the docket in Wabtec II unless otherwise specified.

Determination and the <u>FRC II Final Countervailing Determination</u>.

**BACKGROUND**

*I.        Legal Background*

*A.        Antidumping and Countervailing Duties*

To facilitate fair trade, "[t]he Tariff Act of 1930, as amended, permits Commerce to impose two types of duties on imports that injure domestic industries:" countervailing duties on goods that receive countervailable subsidies from a foreign government, and antidumping duties on goods sold in the United States at less-than-fair value.  <u>Guangdong Wireking Housewares & Hardware Co. v. United States</u>, 745 F.3d 1194, 1196 (Fed. Cir. 2014).  Commerce initiates a countervailing or antidumping duty investigation either upon its own authority or upon the filing of a petition by an interested party.  <u>See</u> 19 U.S.C. §§ 1673a(a)–(b), 1671a(a)–(b).  After an interested party files a petition, Commerce "shall . . . determine whether the petition alleges the elements necessary for the imposition of a duty under [§§] 1673 [or 1671] of this title and contains information reasonably available to the petitioner supporting the allegations, and determine if the petition has been filed by or on behalf of the industry."  <u>Id.</u> §§ 1673a(c)(1)(A), 1671a(c)(1)(A).  If the petition does not sufficiently allege the elements necessary for the imposition of duties or the petition was not filed by or on behalf of the industry, Commerce "shall dismiss the petition, terminate the proceeding, and notify the petitioner in writing of the reasons for the determination."  <u>Id.</u> §§ 1673a(c)(3), 1671a(c)(3).  Where such a petition alleges the elements necessary for the imposition of antidumping or countervailing duties and where the petition has been filed by or on behalf of the industry, Commerce "shall initiate an investigation."  <u>Id.</u> §§ 1673a(c)(2), 1671a(c)(2); <u>see also</u> <u>id.</u> §§ 1673a(b)(1), 1671a(b)(1).

The Commission is separately required to make a preliminary determination as to whether there is a reasonable indication that "an industry in the United States . . . is materially injured, or

is threatened with material injury, or the establishment of an industry in the United States is materially retarded, by reason of imports of the subject merchandise and that imports of the subject merchandise are not negligible." Id. §§ 1673b(a)(1), 1671b(a)(1); see also id. §§ 1673b(a)(2), 1671b(a)(2).

Where Commerce initiates an investigation—and after an affirmative preliminary determination by the Commission as to material injury, threat of material injury, or material retardation—Commerce makes a preliminary determination as to less-than-fair-value sales in antidumping duty investigations and as to countervailable subsidization in countervailing duty investigations. Id. §§ 1673b(b)(1), 1671b(b)(1). Specifically—in an antidumping duty investigation—Commerce "shall make a [preliminary] determination . . . of whether there is a reasonable basis to believe or suspect that the merchandise is being sold, or is likely to be sold, at less[-]than[-]fair value." Id. § 1673b(b)(1). In a countervailing subsidy investigation, Commerce "shall make a [preliminary] determination . . . of whether there is a reasonable basis to believe or suspect that a countervailable subsidy is being provided with respect to the subject merchandise." Id. § 1671b(b)(1)(A). Within 75 days of its preliminary antidumping and countervailing duty determinations, Commerce "shall make a final determination." Id. §§ 1673d(a)(1), 1671d(a)(1). The Commission separately makes its final determination as to material injury, threat of material injury, and material retardation. See id. §§ 1673d(b), 1671d(b).

If Commerce and the Commission both make affirmative final determinations, then Commerce "shall issue an antidumping [or countervailing] duty order." Id. §§ 1673d(c)(2); 1671d(c)(2). If either determination is negative, "the investigation shall be terminated." Id. Commerce thus imposes duties only where both Commerce and the Commission have made affirmative determinations in their respective investigations.

### B.      Scope

When Commerce publishes an antidumping or countervailing duty order, that order must "include a description of the subject merchandise, in such detail as the administering authority deems necessary." Id. §§ 1673e(a)(2), 1671e(a)(2). "Subject merchandise" is "the class or kind of merchandise that is within the scope of an investigation." Id. § 1677(25). The petition is the starting point for the scope language, and "Commerce owes deference to the petitioner's intended scope." M S Int'l, Inc. v. United States, 32 F.4th 1145, 1151 (Fed. Cir. 2022). Ultimately, however, Commerce "has inherent authority to define the scope of an . . . investigation," NTN Bearing Corp. of Am. v. United States, 14 CIT 623, 627, 747 F. Supp. 726, 731 (1990), and "may depart from the scope as proposed by a petition if it determines that petition to be overly broad, or insufficiently specific to allow proper investigation, or in any other way defective." M S Int'l, 32 F.4th at 1151 (internal quotation marks and citation omitted); see also Duferco Steel, Inc. v. United States, 296 F. 3d 1087, 1089 (Fed. Cir. 2002) (While "[t]he petition initially determines the scope of the investigation . . . Commerce has inherent power to establish the parameters of the investigation, so that it would not be tied to an initial scope definition" within the petition." (internal quotation marks and citation omitted)).

### II.      Factual Background

### A.      Freight Rail Couplers ("FRCs")

FRCs "connect two freight cars together by automatically interlocking the knuckles of both FRCs when the freight cars are pushed together, eliminating the need for previously required and potentially dangerous manual input." Certain Freight Rail Couplers and Parts Thereof from China at 9, Inv. Nos. 701-TA-682, 731-TA-1592 (Final), USITC Pub. 5438 (July 2023) ("FRC II Commission Views"). In addition to connecting freight cars, FRCs "reduce shocks when freight cars are in transit or braking." Id. Freight cars typically use two FRCs to allow for coupling

additional freight cars together on both ends of the car.  Id.  FRCs are composed of two main parts—knuckles and coupler bodies—along with other ancillary parts.  Id.  The image below displays a pair of uncoupled FRCs and a pair of coupled FRCs both including the two primary parts—a pair of coupler bodies (in white) and a pair of knuckles (in blue):



Letter from D. Pickard to G. Raimondo, Sec'y of Com., re: Certain Freight Rail Couplers and Parts Thereof from the People's Republic of China and the United Mexican States: Petitions for the Imposition of Antidumping and Countervailing Duties at 9, Case No. A-570-145, Bar Code: 4289650 (Sept. 28, 2022) ("FRC II Petitions").

There are two primary markets for FRCs.  The first is the Original Equipment Manufacturer channel, in which builders incorporate FRCs into new freight railcars.  See FRC II Commission Views at I-12.  The second is the replacement channel, in which railcar owners and maintenance companies replace old FRCs on freight railcars already in service.  See id.

### B.      2021 Investigation of FRCs from China ("FRC I")

On September 29, 2021, Defendant-Intervenor—the Coalition of Freight Coupler Producers (the "Coalition")—filed petitions for the imposition of antidumping and countervailing

duties on U.S. imports of freight rail coupler systems and components from China.  See Letter from D. Pickard to G. Raimondo, Sec'y of Com., re: Certain Freight Rail Coupler Systems and Components Thereof from the People's Republic of China: Petitions for the Imposition of Antidumping and Countervailing Duties at 1–2, Case No. A-570-143, Bar Code: 4165365-01, (Sept. 29, 2021) ("FRC I Petitions Cover Letter").  The Coalition's petitions indicated that "[s]ubject coupler systems and components are included within the scope . . . whether mounted or unmounted, or if joined with non[-]subject merchandise, such as other non-subject system parts or a completed railcar."  Petitions for the Imposition of Antidumping and Countervailing Duties Pursuant to Section 701 and 731 of the Tariff Act of 1930, as Amended at 5, Case No. A-570-143, Bar Code: 4165365-02 (Sept. 29, 2021).  However, "[o]nly the subject coupler system and components are subject to duties if imported with or mounted with other non-subject merchandise."  Id.  Commerce initiated FRC I covering a period of investigation of January 1, 2021 through June 30, 2021 for the antidumping duty investigation, see Freight Rail Coupler Systems and Certain Components Thereof From the People's Republic of China: Initiation of Less Than Fair Value Investigation, 86 Fed. Reg. 58864, 58865 (Dep't Com. Oct. 25, 2021) ("FRC I Antidumping Initiation)", and January 1, 2020 through December 31, 2020 for the countervailing duty investigation, see Freight Rail Coupler Systems and Certain Components Thereof From the People's Republic of China: Initiation of Countervailing Duty Investigation, 86 Fed. Reg. 58878, 58879 (Dep't Com. Oct. 25, 2021) ("FRC I Countervailing Initiation").

During FRC I, Commerce considered arguments from Wabtec and Strato that FRCs incorporated into a full railcar should not be included in the scope.  See Mem. from S. Thompson to S. Fullerton, re: Antidumping and Countervailing Duty Investigations of Freight Rail Coupler Systems and Certain Components Thereof from the People's Republic of China: Final Scope

Memorandum at 4–7, Case Nos. A-570-143 and C-570-144, Barcode: 4245152-01 (Dep't Com. May 23, 2022) ("FRC I Final Scope Mem."). Commerce ultimately issued a scope memorandum determining that the scope should not exclude FRC systems or components that are mounted on or joined to full railcars. Id. at 12.

As a result of FRC I, Commerce determined that imports from China received countervailable subsidies and were sold at less-than-fair value, see FRC I Final Antidumping Determination, 87 Fed. Reg. at 32121; FRC I Final Countervailing Determination, 87 Fed. Reg. at 30869, but the Commission determined that a "domestic industry is not materially injured or threatened with material injury by reason of subject imports of FRCs from China that were found by Commerce to be sold in the United States at [less-than-fair value] and to be subsidized by the government of China." Freight Rail Coupler Systems and Components from China, Inv. Nos. 701-TA-670, 731-TA-1570 (Final) at 35, USITC Pub. 5331 (July 2022) ("FRC I Commission Views"); see also Freight Rail Coupler Systems and Components From China, 87 Fed. Reg. 41144 (ITC July 11, 2022) ("FRC I Final Injury Determination"). On August 3, 2022, Commerce issued an order finding that the "antidumping duty investigation of [FRCs] from [China] has been terminated" because Commission found neither injury nor threat of injury from Chinese imports of FRCs. See generally Liquidation Instructions—Termination, Case No. A-570-143, Bar Code 4271905-01 (Dep't Com. Aug. 5, 2022) ("FRC I Termination"); see also FRC I Final Injury Determination, 87 Fed. Reg. at 41144.

### C.      2022 Investigation of FRCs from China and Mexico ("FRC II")

On September 28, 2022, the Coalition again filed petitions for the imposition of antidumping and countervailing duties on U.S. imports of freight rail coupler systems and components, this time covering imports from both China and Mexico. See generally FRC II Petitions. Similarly to FRC I, the Coalition's petitions indicated that "[s]ubject [FRCs] and parts

are included within the scope . . . whether mounted or unmounted, or if joined with nonsubject merchandise, such as other nonsubject parts or a completed railcar." Id. at 6. However, "[w]hen a subject coupler or subject parts are mounted on or to other nonsubject merchandise, such as a railcar, only the coupler or subject parts are covered by the scope." Id. at 7. Commerce "determined that [the] allegations [regarding material injury] are properly supported by adequate evidence," and subsequently initiated an antidumping duty investigation covering a period of investigation of January 1, 2022 through June 30, 2022, see Certain Freight Rail Couplers and Parts Thereof from China and Mexico: Initiation of Less Than-Fair-Value Investigations, 87 Fed. Reg. 64444, 64445, 64447 (Dep't Com. Oct. 25, 2022), Wabtec II P.R. 97 ("FRC II Antidumping Initiation"), and a countervailing duty investigation covering a period of January 1, 2021 through December 31, 2021, see Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China: Initiation of Countervailing Duty Investigation, 87 Fed. Reg. 64440, 64441 (Dep't Com. Oct. 25, 2022) ("FRC II Countervailing Initiation").

On November 21, 2022, the Commission notified Commerce that it made an affirmative preliminary determination concerning FRCs from China and Mexico. Letter from N. Christ to L. Wang (ITC Nov. 21, 2022), Wabtec II P.R. 123. Commerce subsequently preliminarily determined "that certain [FRCs] and parts thereof . . . from [China] are being, or are likely to be, sold in the United States at less[-]than[-]fair value," and calculated a preliminary estimated weighted-average dumping margin of 169.90 percent. Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value and Preliminary Affirmative Determination of Critical Circumstances, 88 Fed. Reg. 15372, 15372 (Dep't Com. Mar. 13, 2023) ("FRC II Prelim. Antidumping Determination"), Wabtec II P.R. 186; see id., 88 Fed. Reg. at 15373; Mem. from J. Maeder to L. Wang, re: Decision Memorandum

for the Preliminary Determination in the Less-Than-Fair-Value Investigation of Certain Freight Rail Couplers and Parts Thereof from the People's Republic of China (Dep't Com. Mar. 7, 2023), Wabtec II P.R. 184 ("FRC II Antidumping PDM").  Commerce also preliminarily determined that "countervailable subsidies are being provided to producers and exporters of certain [FRCs] and parts thereof . . . from [China] during the period of investigation," and calculated a preliminary countervailing duty rate of 265.99 percent.  Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination and Preliminary Affirmative Critical Circumstances Determination, 88 Fed. Reg. 13425, 13425–26 (Dep't Com. Mar 3, 2023), Wabtec III P.R. 244 ("FRC II Prelim. Countervailing Determination"); Mem. from J. Maeder to A. Elouaradia, re: Decision Memorandum for the Preliminary Determination in the Countervailing Duty Investigation of Certain Freight Rail Couplers and Parts Thereof from the People's Republic of China (Dep't Com. Feb. 27, 2023), Wabtec III P.R. 238 ("FRC II Countervailing PDM").

On March 28, 2023, Commerce issued a preliminary scope memorandum addressing various comments on the scope of the investigation, finding that "[FRCs] attached to or mounted on to railcars are the same class or kind" as [FRCs] covered by the investigation.  Mem. from E. Begnal to J. Maeder, re: Freight Rail Couplers from Mexico and the People's Republic of China: Preliminary Scope Decision Memorandum at 10 (Dep't Com. Mar. 28, 2023), Wabtec II P.R. 198 ("FRC II Prelim. Scope Mem.").  On May 15, 2023, Commerce issued a final scope determination "continu[ing] to find that attachment to freight railcars does not turn [FRCs] into a new article of commerce," and maintaining the scope as including "[FRCs] attached to, or mounted on, freight railcars."  Mem. from E. Begnal to J. Maeder, re: Freight Rail Couplers from Mexico and the People's Republic of China: Final Scope Decision Memorandum at 8 (Dep't Com. May 15, 2023),

Wabtec II P.R. 226 ("FRC II Final Scope Mem."). In its FRC II Final Scope Memorandum, Commerce noted that "the scope briefs repeat many of the arguments previously addressed in . . . [FRC I]," and that its findings in FRC II are "consistent with [FRC I]." Id. at 8–9.

Commerce published its final determinations in May 2023. In its final antidumping duty determination, Commerce continued to find that certain FRCs and parts thereof from China are being, or are likely to be, sold in the United States at less-than fair value. FRC II Final Antidumping Determination, 88 Fed. Reg. at 34485. In its final countervailing duty determination, Commerce continued to find that "countervailable subsidies are being provided to producers and exporters of certain [FRCs] and parts thereof . . . from [China]." FRC II Final Countervailing Determination, 88 Fed. Reg. at 32184. Commerce calculated the same estimated weighted-average dumping rate of 169.90 percent[5] and the same countervailing duty rate of 265.99 percent. FRC II Final Antidumping Determination, 88 Fed. Reg. at 34486; FRC II Final Countervailing Determination, 88 Fed. Reg. at 32186.

### PROCEDURAL HISTORY

Wabtec brought two actions against the Government on September 13, 2023 to challenge Commerce's determinations in the FRC II antidumping and countervailing duty investigations of certain freight rail couplers and parts thereof from China. See Compl., Wabtec II, Sept 13, 2023, ECF No. 9 (challenging antidumping duty determination); Compl., Wabtec III, Sept. 13, 2023, ECF No. 10 (challenging countervailing duty determination). The Coalition moved to intervene as a Defendant-Intervenor in the instant actions under U.S. Court of International Trade ("USCIT") Rule 24, see Mot. to Intervene, Wabtec II, Sept. 18, 2023, ECF No. 17; Mot. to Intervene, Wabtec

---

[5] Commerce calculated an export subsidy offset in its final determination and ultimately adjusted the final weighted average dumping margin to 139.49 percent. FRC II Final Countervailing Determination, 88 Fed. Reg. at 32186. This export subsidy offset adjustment is not at issue here.

III, Sept. 18, 2023, ECF No. 18, and the court granted the motions, see Order Granting Mot. to Intervene, Wabtec II, Sept. 18, 2023, ECF No. 19; Order Granting Mot. to Intervene, Wabtec III, Sept. 18, 2023, ECF No. 18. Strato moved to intervene as Plaintiff-Intervenor in the instant actions under USCIT Rule 24, see Mot. to Intervene, Wabtec II, Oct. 13, 2023, ECF No. 25; Mot. to Intervene, Wabtec III, Oct. 13, 2023, ECF No. 25, and the court granted the motions, see Order Granting Mot. to Intervene, Wabtec II, Oct. 16, 2023, ECF No. 27; Order Granting Mot. to Intervene, Wabtec III, Oct. 16, 2023, ECF No. 28.

On November 22, 2023, Wabtec and Strato indicated their position that Wabtec II and Wabtec III should be consolidated, while the Government and the Coalition opposed consolidation. See Joint Status Rep. and Proposed Briefing Schedule at 2, Wabtec II, Nov. 22, 2023, ECF No. 30; Joint Status Rep. and Proposed Briefing Schedule at 2, Wabtec III, Nov. 22, 2023, ECF No. 30. The court declined to consolidated Wabtec II and Wabtec III and instead joined the cases for hearing and decision. Order Joining Cases, Wabtec II, Nov. 22, 2023, ECF No. 31; Order Joining Cases, Wabtec III, Nov. 22, 2023, ECF No. 31.

On January 22, 2024, Wabtec and Strato filed separate motions for judgment on the agency record under USCIT Rule 56.2. See Pls.' Mot. for J. on the Agency R., Wabtec II, Jan. 22, 2024, ECF No. 32 ("Pl.'s Br."); Pls.' Mot. for J. on the Agency R., Wabtec III, Jan. 22, 2024, ECF No. 32; Pl.-Inter.'s Mot. for J. on the Agency R., Wabtec II, Feb. 5, 2024, ECF No. 35 ("Pl.-Inter.'s Br."); Pl.-Inter.'s Mot. for J. on the Agency R., Wabtec III, Feb. 5, 2024, ECF No. 34.[6] The Government filed its responses on April 5, 2024. See Def.'s Resp. to Pl.'s and Pl.-Inter.'s Mots. for J. on the Agency R., Wabtec II, April 5, 2024, ECF No. 36 ("Gov't Resp."); Def.'s Resp. to

---

[6] Strato's motions "incorporate[] by reference the arguments in the Memorandum[s] of Law filed by Plaintiff Wabtec in support of its 56.2 Motion[s] for Judgment Upon the Agency Record." Pl.-Inter.'s Br. at 3. Strato does not assert any independent arguments.

Pl.'s and Pl.-Inter.'s Mots. for J. on the Agency R., Wabtec III, April 5, 2024, ECF No. 36. Defendant-Intervenor filed its responses on April 19, 2024. See Def.-Inter.'s Resp. to Mot. for J on the Agency R., Wabtec II, Apr. 19, 2024, ECF No. 37 ("Def.-Inter.'s Resp."); Def.-Inter.'s Resp. to Mot. for J. on the Agency R., Wabtec III, Apr. 19, 2024, ECF No. 37. Wabtec filed its replies on May 17, 2024, see Reply in Supp. of Pl.'s Mot. for J. on the Agency R., Wabtec II, May 17, 2024, ECF No. 38 ("Pl.'s Reply"); Reply in Supp. of Pl.'s Mot. for J. on the Agency R., Wabtec III, May 17, 2024, ECF No. 38, and Strato filed letters in lieu of replies on May 24, 2024, see Letter in Lieu of Reply Br., Wabtec II, May 24, 2024, ECF No. 40; Letter in Lieu of Reply Br., Wabtec III, May 24, 2024, ECF No. 40.

With all papers filed, the court held a single oral argument on all motions in both Wabtec II and Wabtec III as scheduled on December 16, 2024. See Scheduling Order, Wabtec II, June 27, 2024, ECF No. 46; Scheduling Order, Wabtec III, June 27, 2024, ECF No. 49. The court requested supplemental briefings addressing additional questions, see Order Requesting Supp'l Brs., Wabtec II, Dec. 20, 2024, ECF No. 51; Order Requesting Supp'l Brs., Wabtec III, Dec. 20, 2024, ECF No. 54, and the parties submitted timely responses, see Pls.' Supp'l Br., Wabtec II, Jan. 24, 2025, ECF No. 53 ("Pl.'s Supp'l Br."); Pls.' Supp'l Br., Wabtec III, Jan. 24, 2025, ECF No. 56; Def.'s Supp'l Br., Wabtec II, Feb. 24, 2025, ECF No. 54 ("Gov't Supp'l Br."); Def.'s Supp'l Br., Wabtec III, Feb. 24, 2025, ECF No. 57; Def.-Inter.'s Supp'l Br., Wabtec II, Mar. 3, 2025, ECF No. 55 ("Def.-Inter.'s Supp'l Br."); Def.-Inter.'s Supp'l Br., Wabtec III, Mar. 3, 2025, ECF No. 58; Pl.'s Supp'l Reply Br., Wabtec II, Mar. 21, 2025, ECF No. 56 ("Pl.'s Supp'l Reply"); Pl.'s Supp'l Reply Br., Wabtec III, Mar. 21, 2025, ECF No. 59.

Pursuant to 28 U.S.C. § 253(c) and USCIT Rule 77(e)(4), both Wabtec II and Wabtec III were reassigned to the undersigned from the Honorable Judge Vaden. Reassignment Order,

Wabtec II, July 7, 2025, ECF No. 59; Reassignment Order, Wabtec III, July 7, 2025, ECF No. 61.

Having confirmed with the parties that "there have been no other developments that alter the need

for a ruling from this [c]ourt or would otherwise impede the [c]ourt's review," see Order for Joint

Status Report, Wabtec II, Aug. 29, 2025, ECF No. 62; Order for Joint Status Report, Wabtec III,

Aug. 29, 2025, ECF No. 64; Joint Status Report, Wabtec II, Sept. 22, 2025, ECF No. 63; Joint

Status Report, Wabtec III, Sept. 22, 2025, ECF No. 65, the court now turns to Plaintiffs' motions

for judgment on the agency record.

### JURISDICTON AND STANDARD OF REVIEW

Jurisdiction lies under 28 U.S.C. § 1581(c). The court will "hold unlawful any

determination, finding or conclusion found . . . to be unsupported by substantial evidence on the

record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial

evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." Broadcom Corp. v. Int'l Trade Comm'n, 28 F.4th 240, 249 (Fed. Cir. 2022).

"The court will find a determination unlawful where Commerce has failed to carry out its

duties properly, relied on inadequate facts or reasoning, or failed to provide an adequate basis for

its conclusions." Rhone-Poulenc, Inc. v. United States, 20 CIT 573, 575, 927 F. Supp. 451, 454

(1996). Commerce "must examine the relevant data and articulate a satisfactory explanation for

its action including a 'rational connection between the facts found and the choice made.'" Motor

Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co. Farm Mut. Auto. Ins. Co., 463 U.S.

29, 43 (1983) (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962))

(referring to the arbitrary and capricious standard); see also Yangzhou Bestpak Gifts & Crafts Co.

v. United States, 716 F.3d 1370, 1378 (Fed. Cir. 2013) (citing Amanda Foods (Viet.) Ltd. v. United

States, 33 CIT 1407, 1417, 647 F. Supp. 2d 1368, 1379 (2009)) (requiring the same of the agency

with respect to the substantial evidence standard). To be supported by substantial evidence, a

determination must account for "whatever in the record fairly detracts from its weight," including "contradictory evidence or evidence from which conflicting inferences could be drawn." Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994) (quoting Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 487–88 (1951)).

## DISCUSSION

### I.      Commerce Did Not Improperly Relitigate FRC I

Recall that—upon the Coalition's filing of petitions on September 29, 2021—Commerce initiated FRC I, investigating U.S. imports of FRC systems and components from China from in January through December 2020 for the countervailing duty investigation and January through June 2021 for the antidumping duty investigation.  See FRC I Petitions Cover Letter; FRC I Antidumping Initiation, 86 Fed. Reg. 58864, FRC I Countervailing Initiation, 86 Fed. Reg. 58878. In FRC I, Commerce terminated the investigation after the Commission determined that the domestic industry is not materially injured or threatened with material injury by reason of subject imports.  See FRC I Termination; FRC I Commission Views at 53; FRC I Final Injury Determination, 87 Fed. Reg. at 41144.  Upon the Coalition's filing of new petitions on September 28, 2022, Commerce initiated FRC II, investigating U.S. imports of FRC systems and components from China and Mexico in January through December 2021 for the countervailing duty investigation and January through June 2022 for the antidumping investigation.  See FRC II Petitions; FRC II Antidumping Initiation, 87 Fed. Reg. at 64445, 64449–50; FRC II Countervailing Initiation, 87 Fed. Reg. at 64441, 64444.  In FRC II, unlike in FRC I, the Commission determined that the domestic industry is materially injured by reason of subject imports.  FRC II Commission Views at 3; see also FRC II China Injury Determination, 88 Fed. Reg. at 43399; FRC II Mexico Injury Determination, 88 Fed. Reg. at 77612.  Commerce went on to make affirmative determinations in both the antidumping and countervailing duty investigations and calculate an

estimated weighted average dumping margin of 169.90 percent and a countervailing duty rate of 265.99 percent. FRC II Final Antidumping Determination, 88 Fed. Reg. at 34486; FRC II Final Countervailing Determination, 88 Fed. Reg. at 32186.

Wabtec argues that Commerce unlawfully permitted petitioner to relitigate the final determination in FRC I. Pl.'s Br. at 13. Wabtec also suggests that "Commerce failed to acknowledge that it had inherent authority to terminate the investigation to preserve the integrity of the prior proceedings." Id. at 13. Finally, Wabtec claims that Commerce improperly refused to apply § 1675(b)(4), which Wabtec suggests "requires that a petitioner show 'good cause' before seeking 'review' of any final determination by Commerce, if less than two years have elapsed." Id. at 14. Wabtec's arguments fail (1) because FRC II is distinct from FRC I, (2) because Commerce has no inherent authority to terminate an investigation outside of its statutory mandates to initiate the investigation and make determinations regarding less-than-fair-value sales and countervailable subsidies, and (3) because § 1675(b)(4) applies only to changed circumstance reviews—not to a new investigation based on different petitions and involving a different scope and period of investigation.

### A.    FRC II Is Not a "Relitigation" of FRC I

Wabtec mischaracterizes FRC II as an improper "relitigat[ion]" of FRC I that would allow for "an endless cycle of reinvestigation whenever [petitioners] are displeased with a prior determination." Pl.'s Br. at 13. As the court recently explained in Wabtec I, 2025 WL 2945805, at *9, this characterization incorrectly suggests that FRC I and FRC II are identical investigations. To the contrary, the scopes of FRC I and FRC II contain key differences including different descriptions of the physical merchandise, different subject countries, and different periods of investigation. Recall that Commerce's investigations in FRC I covered knuckles, coupler bodies, coupler yokes, and follower blocks imported from China from January 2021 through June 2021

for the antidumping duty investigation, and from January 2020 through December 2020 for the countervailing duty investigation. See FRC I Antidumping Initiation, 86 Fed. Reg. at 58865, 58869; FRC I Countervailing Initiation, 86 Fed. Reg. at 58879, 58882. Commerce's investigation in FRC II, on the other hand, covered knuckles and coupler bodies—but not coupler yokes or follower blocks—imported from China and Mexico from January 2022 through June 2022 for the antidumping duty investigation, and from January 2021 through December 2021 for the countervailing duty investigation. See FRC II Antidumping Initiation, 87 Fed. Reg. at 64446, 64449–50; FRC II Countervailing Initiation, 87 Fed. Reg. at 64442, 64445.

The scopes of FRC I and FRC II differ in three ways: the physical merchandise covered, the countries of origin, and the periods of review. FRC I covered physical merchandise that was not included in FRC II—coupler yokes and follower blocks. FRC I also covered only merchandise from China while FRC II covered merchandise from China and Mexico. Finally, the period of review for the FRC I antidumping duty investigation—January through June 2021—is distinct from the period of review for the FRC II antidumping duty investigation—January through June 2022. Similarly, the period of review for the FRC I countervailing investigation—January through December 2020—is distinct from the period of review for the FRC II countervailing investigation—January through December 2021. Because the FRC I and FRC II investigations do not cover identical merchandise, countries, or periods of review, FRC II cannot be accurately characterized as a relitigation of FRC I.

### B. Commerce Has No "Inherent Authority" to Refuse to Initiate an Investigation

Recall that under 19 U.S.C. § 1673a and § 1671a, Commerce "shall . . . initiate[]" an antidumping or countervailing duty investigation "whenever an interested party . . . files a petition with the administering authority, on behalf of an industry, which alleges the elements necessary

for the imposition of the duty . . . and which is accompanied by information reasonably available to the petitioner supporting those allegations." 19 U.S.C. §§ 1673a(b)(1), 1671(b)(1). The elements necessary for the imposition of an antidumping duty include (1) a determination by Commerce "that a class or kind of foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value," and (2) a determination by the Commission that "an industry in the United States" is materially injured or threatened with material injury by reason of the imports. See id. § 1673. Similarly, the necessary elements necessary for the imposition of a countervailing duty include (1) a determination by Commerce that the government of a country is providing "a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported, or sold (or likely to be sold) for importation, into the United States," and (2) the same determination by the Commission that "an industry in the United States" is materially injured or threatened with material injury." Id. § 1671. If the petition does not sufficiently allege the elements necessary for the imposition of duties or the petition was not filed by or on behalf of the industry, Commerce "shall dismiss the petition, terminate the proceeding, and notify the petitioner in writing of the reasons for the determination." Id. §§ 1673a(c)(3), 1671a(c)(3). Where such a petition alleges the elements necessary for the imposition of antidumping or countervailing duties and where the petition has been filed by or on behalf of the industry, Commerce "shall initiate an investigation." Id. §§ 1673a(c)(2), 1671a(c)(2); see also id. §§ 1673a(b)(1), 1671a(b)(1).

Wabtec argues that "Commerce failed to acknowledge that it had inherent authority to terminate the investigation to preserve the integrity of the prior proceedings." Pl.'s Br. at 13. However, once Commerce determines that the petition alleged the elements necessary for the imposition of duties and that the petition was filed by or on behalf of the industry, Commerce is

required to initiate an investigation. See Murphy v. Smith, 583 U.S. 220, 223 (2018) ("[T]he word 'shall' usually creates a mandate, not a liberty.") Here, Commerce considered whether the petitions were filed on behalf of the domestic industry, whether the petitions sufficiently alleged the elements necessary for the imposition of duties, and whether the petitions were accompanied by information reasonably available to the petitioner. Commerce first determined that "the Petition[s] [were] filed on behalf of the domestic industry," based on the support from domestic producers. FRC II Antidumping Initiation, 87 Fed. Reg. at 64445; FRC II Countervailing Initiation, 87 Fed. Reg. at 64441; see also Initiation Checklist from DOC to File Attachment II at 9 (Dep't Com. Oct. 18, 2022), Wabtec II P.R. 93, C.R. 55 ("FRC II Antidumping Initiation Checklist"); Initiation Checklist from DOC to File Attachment II at 9 (Dep't Com. Oct. 18, 2022), Wabtec II P.R. 159, C.R. 102 ("FRC II Countervailing Initiation Checklist"). Commerce next considered the various elements for the imposition of duties, finding that the allegations of material injury and causation and the allegations of sales at less-than-fair value "are properly supported by adequate evidence, and meet the statutory requirements for initiation." FRC II Antidumping Initiation, 87 Fed. Reg. at 64447; FRC II Countervailing Initiation, 88 Fed. Reg. at 64442; see also FRC II Antidumping Initiation Checklist at Attachment III. Similarly, Commerce found "that there is sufficient information to initiate a [countervailing duty] investigation." FRC II Countervailing Initiation, 97 Fed. Reg. at 64442–43; see also FRC II Countervailing Initiation Checklist at Attach. III, 6–7. After finding that the petitions sufficiently alleged all the necessary elements for the imposition of duties, Commerce was required to initiate an investigation.

Absent the withdrawal of the petition or an agreement between interested parties,[7]

---

[7] 19 U.S.C. §§ 1673c and 1671c provide that an investigation may be terminated by either Commerce or the Commission "upon withdrawal of the petition by the petitioner," id. §§ 1673c(a)(1)(A), 1671c(a)(1)(A), and that Commerce "may suspend an investigation" where parties agree to eliminate sales at less-than-fair value, to cease exports of merchandise. id.

Commerce's only power to "terminate" an investigation after initiation relevant here is through a negative determination during the antidumping or countervailing investigation. Recall that—in an antidumping duty investigation—Commerce "shall make a . . . determination . . . of whether there is a reasonable basis to believe or suspect that the merchandise is being sold, or is likely to be sold, at less[-]than[-]fair value." 19 U.S.C. § 1673b(b)(1)(A). In a countervailing subsidy investigation—Commerce "shall make a determination . . . of whether there is a reasonable basis to believe or suspect that a countervailable subsidy is being provided with respect to the subject merchandise." Id. § 1671b(b)(1). If Commerce's less-than-fair-value or countervailable subsidy determination is negative, "the investigation shall be terminated." Id. §§ 1673d(c)(2), 1671d(c)(2). Beyond finding that merchandise is not being sold at less-than-fair value or that there is no reasonable basis to believe a countervailable subsidy is being provided, Commerce has no inherent authority to terminate an investigation after it is initiated.

Wabtec argues that Commerce has the authority to refuse to initiation or to terminate an investigation specifically "to guarantee the integrity and finality of previous antidumping determinations." Pl.'s Br. at 20. Wabtec states that the principle of finality "goes to the heart of an agency's power to authoritatively resolve the questions within its jurisdiction." Id. at 21 (emphasis omitted). However—even if Commerce did have such an authority—FRC II in no way compromised the integrity or finality of FRC I. Commerce's initiation of FRC II did not "effectively reviv[e] a prior investigation," as Wabtec suggests. Id. at 21. In FRC I, Commerce determined (1) that countervailable subsidies were being provided to producers and exporters of FRCs from China during the period of January 1, 2020, through December 31, 2020, FRC I Final

---

§§ 1673c(b), 1671c(b), or to revise prices from exports who account for substantially all of the imports into the United States, id. §§ 1673c(c)(1), 1671c(c)(1). None of these circumstances are relevant here.

Countervailing Determination, 87 Fed. Reg. at 30869, and (2) that FRCs from China were being, or were likely to be, sold in the United States at less-than-fair value during the period of January 1, 2021, through June 30, 2021, FRC I Final Antidumping Determination, 87 Fed. Reg. at 32121. Those determinations are no less final as a result of Commerce's initiation of FRC II and ultimate determinations (1) that countervailable subsidies were being provided to producers and exporters of FRCs from China during the period of January 1, 2021, through December 31, 2021, FRC II Final Countervailing Determination, 88 Fed. Reg. at 32184, and (2) that FRCs were being, or were likely to be, sold in the United States at less-than-fair value during the period of January 1, 2022, through June 30, 2022, FRC II Final Antidumping Determination, 88 Fed. Reg. at 34485.

Where Commerce determines that the petition alleged the elements necessary for the imposition of duties and that the petition was filed by or on behalf of the industry, Commerce is required to initiate an investigation. Once an investigation is initiated, and absent withdrawal of the petition or an agreement between interested parties, Commerce can only "terminate" the investigation through a negative determination as to merchandise being sold at less-than-fair value in the case of an antidumping duty investigation, or that there is no reasonable basis to suspect that countervailable subsidies were being provided to producers and exporters in the case of a countervailing duty investigation. Here, Commerce properly initiated the investigation based on the content of the petition and made an affirmative determination in both the antidumping and countervailing duty investigations. Commerce had no separate authority to refuse to initiate or to terminate the investigation to protect the integrity and finality of FRC I—an investigation with a distinct scope from FRC II.

### C.      *Section 1675(b)(4) Applies Only to Changed Circumstance Reviews*

Wabtec separately argues that the "Petitioner was required to establish—and Commerce was required to find—'good cause' to initiate and conduct the investigation in FRC II." Pls.' Br.

at 16. Wabtec points to 19 U.S.C. § 1675(b)(4), which states that "[i]n the absence of good cause shown . . . the Commission may not review a [final injury determination] . . . less than [twenty-four] months after the date of publication of notice of that determination or suspension." See also Pl.'s Br. at 14.

The court's "job is to interpret [statutory] words consistent with their 'ordinary meaning.' " Wisconsin Central Ltd. v. United States, 585 U.S. 274, 277 (2018) (quoting Perrin v. United States, 444 U.S. 37, 42 (1979)). "While the title of an act will not limit the plain meaning of the text, it may be of aid in resolving an ambiguity." Maguire v. Comm'r of Internal Revenue, 313 U.S. 1, 9 (1941) (citations omitted); see also Fed. Trade Comm'n v. Mandel Bros., Inc., 359 U.S. 385, 388–89 (1959). Section 1675(b) is titled "[r]eviews based on changed circumstances." FRC II is not a review based on changed circumstances, and it is a stretch to suggest that a provision within a subsection titled "[r]eviews based on changed circumstances" applies to anything but reviews based on changed circumstances. 19 U.S.C. § 1675(b)(4).

Wabtec highlights that two other paragraphs in the subsection are explicitly limited to review "under this subsection." Pl.'s Br. at 14 (citing 19 U.S.C. § 1675(b)(2)–(3)). According to Wabtec, § 1675(b)(4) applies to reviews of any final Commerce and Commission determinations because it does not contain the same reference to review "under this subsection." Id. "[W]e do not usually pick a conceivable-but-convoluted interpretation over the ordinary one." Stanley v. City of Sanford, Fla., 606 U.S. __, __, 145 S. Ct. 2058, 2065–66 (2025). The fact that paragraphs (2) and (3) explicitly refer to reviews "under this subsection" does not obviate the fact that paragraph (4) also falls within the same subsection covering "[r]eviews based on changed circumstances." 19 U.S.C. § 1675(b). There is no reason to assume it applies to anything other than changed circumstance reviews.

Even ignoring the title of the subsection, the text of § 1675(b)(4) provides an instance where Commerce may not "review" a determination.  Id.  § 1675(b)(4).  As discussed above, FRC II is not a review of FRC I; it is a new investigation with a different scope.  As a result, § 1675(b)(4) does not require Commerce to find good cause before making a determination in FRC II.

> **II.  Commerce Must Consider Whether the Proposed Scope Language Includes Merchandise that Cannot Cause Injury by Reason of Import Based on the Coalition's Theory of Injury**

Recall that Commerce—upon initiation of the investigations—defined the scope as covering FRCs "whether mounted or unmounted, or if joined with nonsubject merchandise, such as other nonsubject parts or a completed railcar."  FRC II Antidumping Initiation, 87 Fed. Reg. at 64450; FRC II Countervailing Initiation, 87 Fed. Reg. at 64444.  After considering comments from the parties regarding the inclusion of attached FRCs in the scope language, Commerce "[did] not find the respondent parties' arguments to be persuasive," and resultingly "[did] not modif[y] the scope to exclude [FRCs] attached to, or mounted on, freight railcars."  FRC II Final Scope Mem. at 8.

Wabtec argues that Commerce erred in "including within the scope FRCs attached to railcars abroad and imported into the United States as a component part of a railcar," because (1) the Coalition's underlying theory of injury is not cognizable, Pl.'s Br. at 22; (2) an FRC is a separate class or kind of merchandise from a freight railcar, id. at 33; and (3) FRCs are substantially transformed when they are attached to railcars, id. at 41.  While Commerce has significant discretion in determining the scope of an investigation and any subsequent duty order, Commerce incorrectly disclaimed any authority to modify the proposed scope based on Wabtec's argument that the Coalition's theory of injury is not cognizable.  Commerce's separate determinations that attached FRCs are the same class or kind of merchandise as unattached FRCs and that FRCs are not substantially transformed when attached to a full railcar are supported by substantial evidence.

The court remands Commerce's determinations to consider whether to modify the scope language to exclude attached FRCs based on Wabtec's argument that the Coalition's theory of injury regarding attached FRCs is not cognizable.

### A.    Commerce Cannot Disclaim Authority to Modify the Scope Language Based on an Argument that the Petitioner's Theory of Injury is not Cognizable

Throughout the investigation, Wabtec argued that attached FRCs should not be included in the scope because "FRCs are not capable of causing a cognizable injury to the domestic FRC industry when they are imported directly from China into a third country and mounted on and incorporated into new rail cars there."  Letter from D. Morrell to G. Raimondo, re: Certain Freight Rail Couplers and Parts Thereof from China and Mexico: Wabtec's Scope Letter Brief at 2, Case No. A-570-145, Barcode: 4363875-01 (Apr. 10, 2023) ("Wabtec's Final Scope Comments"); see also Letter from D. Morrell to G. Raimondo, re: Certain Freight Rail Couplers and Parts Thereof from China and Mexico: Comments on Proposed Scope at 4, Case No. A-570-145, Barcode: 4311522-01 (Nov. 17, 2022) ("Wabtec's Prelim. Scope Comments").   In explaining its determination not to exclude attached FRCs from the scope language, Commerce disclaimed all authority to analyze Wabtec's arguments regarding the Coalition's theory of injury, stating that "the question of injury to the domestic [FRC] industry . . . is within the purview of the [Commission]."  FRC II Final Scope Mem. at 12.

Wabtec now raises before the court its argument that attached FRCs should be excluded from the scope because they cannot cause injury by reason of import.  Pl.'s Br. at 23.  Wabtec highlights that "duties are permitted only where, but for 'imports of' the subject merchandise, the domestic injury would have avoided injury."  Id. at 24.  Wabtec states that "where the domestic industry loses [a sale to new railcar builders in Mexico], the injury to the domestic industry is the same whether or not the merchandise that won the sale later enters the United States (i.e., where

or not there is an <u>import</u> of anything)." <u>Id.</u> at 24 (emphasis included in original). According to Wabtec, the Coalition's theory of injury is not cognizable because FRCs only cause injury to the domestic industry through the loss of export sales. <u>See id.</u> at 23. By including attached FRCs in the scope, Wabtec argues Commerce erred in "disclaim[ing] any responsibility for assessing Petitioner's theory of injury when defining scope." <u>Id.</u> at 27. The Government counters—just as Commerce stated during the investigation—that "[i]t is the [Commission], not Commerce, that determines whether the domestic industry has suffered the requisite material injury." Gov't Br. at 40; <u>see also</u> FRC II Final Scope Mem. at 12. According to the Government, "Commerce reasonably declined to remove from the scope '[FRCs] mounted or joined to railcars.' " Gov't Br. at 27.

"Commerce has the authority to initially determine the scope of the investigation, as well as the authority to modify the scope language until the final order is issued, based on the agency's findings." <u>Kyocera Solar, Inc. v. United States</u>, 41 CIT __, __, 253 F. Supp. 3d 1294, 1315 (2017); <u>see also</u> <u>Mitsubishi Elec. Corp. v. United States</u>, 898 F.2d 1577, 1582 (Fed. Cir. 1990) (Commerce has "the responsibility to determine the proper scope of the investigation and of the . . . order."). "Commerce has inherent power to establish the parameters of the investigation so that it would not be tied to an initial scope definition that may not make sense in light of the information available to [Commerce] or subsequently obtained in the investigation." <u>Duferco Steel</u>, 296 F.3d at 1089 (internal quotation marks and citation omitted). Commerce may "redefine and clarify the parameters of its investigation" if it "determine[s] the petition to be overly broad, or insufficiently specific to allow proper investigation, or in any other way defective." <u>NTN Bearing</u>, 14 CIT at 627, 747 F. Supp. at 731. When making a final determination relevant to the imposition of duties under § 1673 or § 1671, Commerce must "include in a final determination . . . an explanation of

the basis for its determination that addresses relevant arguments, made by interested parties . . . ." 19 U.S.C. § 1677f(i)(3)(A). Commerce must also comply with the general requirement that agencies establish and articulate a "rational connection between the facts found and the choice[s] made." Burlington Truck Lines, 371 U.S. at 168.

Commerce correctly noted in its scope determination that "the question of injury to the domestic [FRC] industry . . . is within the purview of the [Commission]." FRC II Final Scope Mem. at 12. The Government similarly states that the Commission—not Commerce—is tasked with determining that "whether the domestic industry has suffered the requisite material injury." Gov't Br. at 40; see also 19 U.S.C. §§ 1673b(a), 1671b(a). However, the fact that the Commission is responsible for making a final injury determination does not absolve Commerce of its responsibility to define the scope of the investigations and the final order—a responsibility that lies solely with Commerce. See 19 U.S.C. §§ 1673e(a)(2), 1671e(a)(2); see also Nucor Corp. v. United States, 42 CIT __, __, 296 F. Supp. 3d 1276, 1282 (2018) ("It is Commerce, not the [Commission], that determines the 'class or kind' of imported merchandise that will be subject to investigation."); Torrington Co. v. United States, 42 CIT __, __, 747 F. Supp. 744, 748 (1990), aff'd 938 F.2d 1278 (Fed. Cir. 1991) ("[T]he [Commission] does not have the authority to modify [Commerce's] finding of class or kind."); Kyocera Solar, Inc. v. United States Int'l Trade Comm'n, 844 F.3d 1334, 1339 (Fed. Cir. 2016).

Where the petitioner's proposed scope is overly broad or defective because it includes merchandise that does not cause any cognizable injury, Commerce "possesse[s] inherent authority to redefine and clarify the parameters of its investigation." NTN Bearing, 14 CIT at 627, 747 F. Supp 731. While Commerce has "broad discretion to define the scope of its investigation," Trans Texas Tire, LLC v. United States, 45 CIT __, __, 519 F. Supp. 3d 1275, 1286 (2021), it cannot

disclaim all authority to modify the scope language simply because an argument proposing such a modification relates to injury. Such a conclusion would mean that petitioners could sneak products that cannot cause injury by reason of import into duty orders simply by including them in proposed scope language that also includes products that cause significant injury. So long as some in-scope merchandise causes a large enough injury to result in the Commission's affirmative injury determination regarding the merchandise as a whole, the in-scope merchandise causing the injury could mask the presence of in-scope merchandise that causes no injury whatsoever. It falls to Commerce to tailor the scope to avoid such an "overly broad" result. See NTN Bearing, 14 CIT at 627, 747 F. Supp. at 731.

Commerce's authority to tailor scope language to avoid such overly broad results does not encroach upon the Commission's responsibility to evaluate the existence of injury. Wabtec does not argue that attached FRCs do not cause injury—a determination that lies with the Commission—but that the Coalition's allegations "do not state a viable theory of injury." Pl.'s Br. at 23. The Coalition stated during FRC I that attached FRCs should be in scope precisely because "U.S. and Chinese FRC producers compete head-to-head for sales for rail cars produced in Mexico and which are for ultimate use in the United States." Letter from D. Pickard to G. Raimondo, re: Freight Rail Car Coupler Systems and Certain Components Thereof from the People's Republic of China: Rebuttal Scope Comments at 7, Case No. A-570-143, Bar Code: 4183620-01 (Nov. 18, 2021) ("Coalition's FRC I Rebuttal Scope Comments"). Wabtec suggests that this theory of injury reflects the loss of FRC sales to new railcar builders in Mexico. Id. at 24. According to Wabtec, this injury is the same regardless of if the merchandise ever enters the United States. Id. Analyzing the Coalition's "theory of injury" as Wabtec suggests does not require Commerce to engage in any of the analysis that the Commission undertakes to determine whether attached FRCs cause injury.

The Government is also correct that " 'Commerce owes deference to the petitioner's intended scope' of the investigation." Gov't Br. at 29 (quoting Matra Ams., LLC v. United States, 48 CIT __, __, 681 F. Supp. 3d 1339, 1350 (2024) (quoting M S Int'l, 32 F.4th at 1151)). However, again, this deference does not absolve Commerce of its authority to define the scope of the investigation and any subsequent orders. Recall that "Commerce has inherent power to establish the parameters of the investigation so that it would not be tied to an initial scope definition that . . . may not make sense in light of the information available to [Commerce] or subsequently obtained in the investigation." Duferco Steel, 296 F.3d at 1089 (internal quotation marks and citation omitted). Deference to the petitioner's intended scope does not prevent Commerce from establishing a scope that reflects information obtained during the investigation—including relevant arguments from interested parties.

In sum, Commerce has "the responsibility to determine the proper scope of the investigation and of the . . . order." Mitsubishi Elec., 898 F.2d at 1582. Additionally, Commerce must provide "an explanation of the basis for its determination that addresses relevant arguments[] made by interested parties." 19 U.S.C. § 1677f(i)(3)(A). Because Commerce failed to carry out its duty to provide an adequate response to Wabtec's argument that the Coalition's theory of injury was not cognizable, Commerce's determinations are not in accordance with law. Rhone-Poulenc, Inc. v. United States, 20 CIT 573, 575, 927 F. Supp. 451, 454 (1996) ("The court will find a determination unlawful where Commerce has failed to carry out its duties properly, relied on inadequate facts or reasoning, or failed to provide an adequate basis for its conclusions.").

### B.    Commerce Analysis of Whether Unattached FRCs Are a Separate Class or Kind of Merchandise from Attached FRCs is in Accordance with Law

Wabtec separately argues that Commerce improperly considered "whether an unattached FRC is a separate class or kind of merchandise from an attached FRC." Pl.'s Br. at 33 (emphasis

in original).  According to Wabtec, "the relevant question is whether an FRC is a separate class or kind of merchandise from a freight rail car."  Id.  The Government counters that "Commerce reasonably declined 'to compare the finished downstream product,' i.e., railcars, to [FRCs] because 'the scope language does not cover' railcars."  Id. at 36 (quoting FRC II Final Scope Determination at 11).  Wabtec's argument fails because it relies on the incorrect premise that Commerce included full railcars within scope.

Sections 1673 and 1671 state that duties shall be imposed on a class or kind of merchandise. See 19 U.S.C. §§ 1673(1), 1671(1).  Recall that Commerce's final scope language includes "certain [FRCs] and parts thereof," and that "[s]ubject [FRCs] and parts are included within the scope whether finished or unfinished, whether imported individually or with other subject or nonsubject parts, whether assembled or unassembled, whether mounted or unmounted, or if joined with nonsubject merchandise, such as other nonsubject parts or a completed railcar."  FRC II Final Antidumping Determination, 88 Fed. Reg. at 34486; FRC II Final Countervailing Determination, 88 Fed. Reg. at 32186–87.  This language does not suggest that Commerce included full railcars within the scope.  In fact, the scope language explicitly states that "[w]hen a subject coupler or subject parts are mounted on or to other nonsubject merchandise, such as a railcar, only the coupler or subject parts are covered by the scope."  FRC II Final Antidumping Determination, 88 Fed. Reg. at 34486; FRC II Final Countervailing Determination, 88 Fed. Reg. at 32187.  This language leaves no doubt that Commerce did not include full railcars in scope.  Wabtec's argument that Commerce should have considered whether FRCs are the same class or kind of merchandise as full railcars and subsequently determined that the scope language in the petition included more than one "class or kind of foreign merchandise," is without merit.

Court Nos. 23-00160 and 23-00161

Wabtec cites to multiple cases to argue for a general principle that "when an import consists of multiple parts, it is evaluated as a whole." Pl.'s Br. at 35 (emphasis omitted). However, none of these cases suggest that such an overarching principle would apply to Commerce scope definition determinations. Instead, these cases all turn on specific language within the harmonized tariff schedule and within existing scope language that is not relevant here. For example, in Rollerblade, Inc. v. United States, the U.S. Court of Appeals for the Federal Circuit ("the Federal Circuit") upheld Customs' classification of roller skate boots without wheels attached as sports footwear rather than as roller skates and parts thereof. 112 F.3d 481, 482–83 (Fed. Cir. 1997). The Federal Circuit's analysis in Rollerblade relied entirely upon the specific language within the harmonized tariff schedule defining sports footwear and roller skates. See 112 F.3d at 486–87 ("The answer to [the] question is found in the Tariff Schedules themselves and the accompanying notes."). Nowhere did the Federal Circuit suggest or rely on a broad principle that "when an import consists of multiple parts, it is evaluated as a whole," as Wabtec suggests. Pl.'s Br. at 35 (emphasis omitted). Even if it did, there is no indication that any of the Federal Circuit's reasoning in analyzing the Customs classification determination in Rollerblade would apply to Commerce scope definitions in antidumping and countervailing duty investigations and orders.[8]

---

[8] The other cases Wabtec cites are equally inapposite. In MacLean Power, LLC v. United States, the U.S. Court of International Trade ("USCIT") remanded Commerce's scope ruling that an assembled product falls within scope language covering metal washers because that language "makes no mention of the importation of [metal washers] as assembled as a component of a larger product." __ CIT __, __, 359 F. Supp. 3d 1367, 1371 (2019). Again, the USCIT's analysis rested entirely upon the specific existing scope language, and neither relied upon nor asserted the broad notion that "when an import consists of multiple parts, it is evaluated as a whole," as Wabtec suggests. Pl.'s Br. at 35; see also MacLean Power, 359 F. Supp. 3d at 1371. In another case that Wabtec cites, Pomeroy Collection, Ltd. v. United States, the USCIT found that glass vessels containing candles are "properly classifiable . . . as '[l]amps and lighting fittings," rather than as decorative glassware. 32 CIT 526, 528, 559 F. Supp. 2d 1374, 1378 (2008). Just as in the other cases Wabtec cites, the USCIT did not mention or apply the notion that an import consisting of multiple parts must be evaluated as a whole, as Wabtec suggests. Pl.'s Br. at 35. Instead, the USCIT applied common tariff classification rules known as the "General Rules of Interpretation,"

Wabtec's argument that Commerce should have considered whether FRCs are a separate class or kind of merchandise from a freight railcar is without merit because the scope language expressly noted that "[w]hen a subject coupler or subject parts are mounted on or to other nonsubject merchandise, such as a railcar, only the coupler or subject parts are covered by the scope." FRC II Final Antidumping Determination, 88 Fed. Reg. at 34486; FRC II Final Countervailing Determination, 88 Fed. Reg. at 32186–87. Commerce properly considered—based on the scope language in the petition—whether attached FRCs are the same class or kind of merchandise as unattached FRCs.

### C. Commerce's Substantial Transformation Determination is in Accordance with Law and Supported by Substantial Evidence

Finally, Wabtec argues that Commerce "should have found that [FRCs undergo a substantial transformation], because they are transformed into an integral part of a complete railcar." Pl.'s Br. at 41. "A substantial transformation occurs where, as a result of manufacturing or processing steps, the product loses its identity and is transformed into a new product having a new name, character and use." Bell Supply Co., LLC v. United States, 888 F.3d 1222, 1228 (Fed. Cir. 2018) (cleaned up). This includes when distinct "parts . . together form a new article" of commerce. Uniden Am. Corp. v. United States, 24 CIT 1191, 1195, 120 F. Supp. 2d 1091, 1095 (2000). "To determine whether there has been substantial transformation, Commerce looks to factors such as (1) the class or kind of merchandise; (2) the nature and sophistication of processing in the country of exportation; (3) the product properties, essential component of the merchandise, and intended end-use; (4) the cost of production/value added; and (5) level of investment." Bell

---

or the "GRIs," set forth at the beginning of the harmonized tariff schedule, which are not relevant to Commerce's scope determinations. See Pomeroy, 32 CIT at 536, 559 F. Supp. 2d at 1385 ("[T]he four pieces of merchandise here in dispute are properly classified [as lamps] through the straightforward application of GRI 1 and GRI 2(a).").

Supply, 888 F.3d at 1228–29.

### 1.      Commerce's Substantial Transformation Determination is in Accordance with Law

According to Wabtec, Commerce failed to apply the correct legal standard, Pl.'s Br. at 41, and relied on flawed rationales in finding no substantial transformation, id. at 42. The Government counters that Commerce "need not apply the same [substantial transformation] analysis when establishing the scope of the order as when deciding whether a particular product falls within the scope of an existing order." Gov't Br. at 33. Additionally, the Government claims that—even if Commerce needed to apply the full substantial transformation analysis—Commerce's basis for rejecting Wabtec's arguments regarding substantial transformation is reasonably discernable and therefore sufficient. Id. at 34.

First, Bell Supply does not involve Commerce's establishment of scope language but instead deals with a scope ruling where Commerce interprets existing scope language to determine whether a particular product falls within that scope. See generally Bell Supply, 888 F.3d at 1228. Substantial transformation analysis is a metric to determine "whether the processes performed on merchandise in a country are of such significance as to require that the resulting merchandise be considered the product of the country in which the transformation occurred." Id. at 1229 (internal quotation marks and citation omitted). While "Commerce has not limited the substantial transformation test to country[-]of[-]origin determinations," substantial transformation is only usually relevant where the scope language is ambiguous as to whether a specific product at issue should be considered in scope. See Meridian Prods., LLC v. United States, 851 F.3d 1375, 1381 (Fed. Cir. 2017) ("If the scope is unambiguous, it governs."); Bell Supply Co., LLC v. United States, 39 CIT 948, 970, 83 F. Supp. 3d 1311, 1328 (2015) ("finding that Commerce must first "interpret the actual words of an order when it conducts a scope inquiry" before conducting a

substantial transformation analysis.).  When establishing scope language, Commerce need not consider whether specific merchandise is in-scope and can clarify ambiguous language without resorting to substantial transformation analysis.  When Commerce explicitly includes merchandise in the scope language—as it did here with attached FRCs—substantial transformation analysis is unnecessary to determine whether that merchandise is in scope.  FRCs attached to railcars are in scope because the scope language explicitly includes them, and Commerce need not have determined whether they are substantially transformed when attached to a railcar.

Despite this, Commerce did consider whether FRCs are substantially transformed when attached to railcars.  In considering substantial transformation in this context, "Commerce enjoy[s] greater discretion" in establishing scope language before any final determination or order issues than it does in modifying the scope after an order has issued.  M S Int'l, 32 F.4th at 1152.  In fact, Commerce's "discretion concerning scope clarification at the investigatory stages is extensive." Minebea Co. v United States, 16 CIT 20, 23, 782 F. Supp. 117, 121 (1992), aff'd, 984 F.2d 1178 (Fed. Cir. 1993).

Commerce sufficiently explained that FRCs "do not undergo further processing or physical changes when attached to or removed from railcars."  FRC II Final Scope Mem. at 9.  Bell Supply states that "[a] substantial transformation occurs where, 'as a result of manufacturing or processing steps . . . , the [product] loses its identity and is transformed into a new product having a new name, character and use."  888 F.3d at 1228 (quoting Bestfoods v. United States, 165 F.3d 1371, 1373 (Fed. Cir. 1999)).  Recall that "[t]o determine whether there has been a substantial transformation, Commerce looks to factors such as," the kind of merchandise, the nature of processing, the product properties, the cost of production, and the level of investment.  Id. at 1228–29 (emphasis added). Here, Commerce considered whether FRCs are a permanent part of the railcar and whether FRCs

undergo further processing or physical changes when attached to railcars. These are factors similar to those enumerated by the Federal Circuit in <u>Bell Supply</u> and thus are relevant to Commerce's determination as to whether "the product loses its identity and is transformed into a new product." <u>Id.</u> at 1228. The words "such as" indicate that Commerce need not apply every <u>Bell Supply</u> factor as enumerated. <u>Id.</u> at 1228–29. Because substantial transformation is not a necessary test to apply when establishing scope language, because Commerce has "extensive" discretion when establishing scope language, and because Commerce considered similar factors to those enumerated in <u>Bell Supply</u>, its somewhat abbreviated analysis of whether FRCs are substantially transformed when attached to a railcar is in accordance with law.

### 2. *Commerce's Substantial Transformation Determination Is Supported by Substantial Evidence*

Wabtec also argues that Commerce relied on flawed rationales in determining that FRCs are not substantially transformed when attached to railcars. Pl.'s Br. at 42. However, Commerce's conclusions that (1) FRCs are not permanently affixed to railcars and (2) FRCs do not undergo further processing or physical changes when attached to a railcar are supported by substantial evidence. Commerce noted that Strato previously "described the assembly of a [FRC] to a railcar indicating that a [FRC] is not a permanently affixed component," during FRC I. FRC II Final Scope Mem. at 9 (citing Letter from A. Schutz to Sec'y of Com., re: Response to Scope Questions: Antidumping and Countervailing Duty Investigation of Freight Rail Coupler Systems and Certain Components Thereof from the People's Republic of China at 11–13, Case No. A-570-143, Bar Code: 4214539-01 (Feb. 22, 2022)). Commerce also noted that a domestic producer of FRCs explained that "[s]ystem components need to be inspected and replaced periodically due to wear or damage, so the parts need to be accessible and removable." <u>Id.</u> at 10 (citing Letter from D. Heffner to G. Raimondo, re: Certain Freight Rail Couplers and Parts Thereof from China and

Mexico: New Factual Information Supporting CBP Video Call Memo at Attachment 1, Case No. A-570-145, Bar Code: 4350879-01 (Mar. 7, 2023)). Additionally, Commerce considered "evidence demonstrate[ing] that within the freight railcar industry, it is common for freight rail couplers to be excluded from drawings and schematics of freight railcars." Id. (citing Letter to G. Raimondo from D. Pickard, re: Certain Freight Rail Couplers and Parts Thereof from China and Mexico: Response to Memorandum Regarding Video Calls with U.S. Customs and Border Protection at 5-7 and Exs. 1–4, Case No. A-570-145, Bar Code: 4351038-01 (Mar 7, 2023) ("Coalition's Resp. to Video Call Mem."). Finally, Commerce noted "evidence indicating that OEMs design freight railcars without any couplers because railcars can often be used with a variety of coupler types, and couplers are replaced periodically." Id. (citing Coalition's Resp. to Video Call Mem. at 5–6 and Exhibits 1; Letter from D. Heffner to G. Raimondo, re: Comments on Product Characteristics at Ex. 2, Case No. A-570-145, Bar Code 4308607-01 (November 7, 2022)). Commerce's conclusion that FRCs "are not substantially transformed into a distinct class or kind of merchandise when they are attached to a freight railcar," is supported by substantial evidence. Id. at 9.

While Commerce correctly analyzed whether attached FRCs are the same class or kind of merchandise as unattached FRCs and while Commerce's determination that FRCs are not substantially transformed when attached to a railcar is in accordance with law and supported by substantial evidence, Commerce failed to address arguments by Wabtec that the Coalition's theory of injury required exclusion of attached FRCs from the scope language. Because Commerce has the authority to modify scope language where the petition's language is overly broad or otherwise defective, and because an analysis of whether a theory of injury is cognizable is distinct from the

Commission's determination as to whether injury exists, the court remands Commerce's final determinations to reassess whether attached FRCs should be excluded from the scope language.

## CONCLUSION

For the reasons stated above, the court holds that (1) Commerce was not required to refuse to initiate FRC II or to terminate FRC II after initiation because FRC II was not a relitigation of FRC I and (2) Commerce erred in disclaiming any authority to consider whether attached FRCs should be excluded from the scope language based on a lack of cognizable injury. As a result, the court remands Commerce's final determinations, see FRC II Final Antidumping Determination, 88 Fed. Reg. 34485; FRC II Final Countervailing Determination, 88 Fed. Reg. 32184, for Commerce's reconsideration or further explanation of its decision not to exclude attached FRCs from the scope language. It is hereby:

**ORDERED** that upon consideration of Wabtec and Strato's motions for judgment on the agency record, see Pl.'s Mot. for J. on the Agency R., Jan. 22, 2024, ECF No. 32; Plaintiff-Intervenor's Mot. for J. on the Agency R., Feb. 5, 2024, ECF No. 35, Commerce is instructed to reconsider whether to modify the scope language to exclude attached FRCs, and it is further

**ORDERED** that Commerce shall file its remand redetermination with the court within ninety days of the date of this opinion. The timeline for filings and comments regarding the remand redetermination shall proceed according to USCIT Rule 56.2(h).

**SO ORDERED**.

/s/ Gary S. Katzmann
Gary S. Katzmann, Judge

Dated: December 23, 2025
       New York, New York